**Daniel W. KINARD, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 92–CO–1067.

District of Columbia Court of Appeals.

Argued Sept. 28, 1993.
Decided Dec. 29, 1993.

David A. Handzo, Washington, DC, for appellant.

Ann K.H. Simon, Asst. U.S. Atty., with whom J. Ramsey Johnson, U.S. Atty., at the time the brief was filed, John R. Fisher, June M. Jeffries, and Leslie A. Blackmon, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before SCHWELB and WAGNER, Associate Judges, and BELSON, Senior Judge.

WAGNER, Associate Judge:

Following a jury trial, appellant, Daniel W. Kinard, was found guilty of first-degree felony murder while armed (D.C.Code §§ 22–2401, –3202 (1993 Supp.)), second-degree murder while armed (D.C.Code §§ 22–2401, –3202 (1993 Supp.)),[1] robbery while armed (D.C.Code §§ 22–1901, –3202 (1989 & 1993 Supp.)), attempted robbery while armed (D.C.Code §§ 22–2903, –3202 (1989 & 1993 Supp.)), carrying a pistol without a license (CPWL) (D.C.Code § 22–3204(a) (1993 Supp.)), and possession of a firearm during a crime of violence (PFCV) (D.C.Code § 22–3204(b) (1993 Supp.)). Prior to sentencing, Kinard filed a motion for new trial pursuant to Super.Ct.Crim.R. 33 based on a claim of ineffective assistance of counsel. As the principal basis for the claim, Kinard asserted that his attorney elicited testimony from him at trial which resulted in the introduction of otherwise inadmissible other crimes evidence. He also argued that the court's refusal to grant a mistrial after his lead counsel was hospitalized deprived him of his Sixth Amendment right to counsel by forcing him to proceed with one attorney who was allegedly "constructively" absent at times, and two others who were physically absent during a part of the trial. After an evidentiary hearing, the trial court denied the motion, concluding that Kinard had failed to show prejudice under the standard set out in *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). The trial court also rejected Kinard's arguments that the circumstances presented fell within the standard for cases involving the "absence of counsel" where prejudice can be presumed. *See id.* at 692, 104 S.Ct. at 2067. On appeal Kinard challenges each of these rulings. We affirm the trial court's rulings; however, we remand with instructions to vacate one of appellant's two murder convictions.[2]

1. This count was indicted originally as armed first-degree (premeditated) murder. However, the count was submitted to the jury on the lesser-included offense of second-degree murder while armed.

## I.

### A. The Trials

Kinard and a co-defendant, Shawn Blair, were indicted for armed first-degree felony murder, one count of first-degree murder while armed, four counts of armed robbery, three counts of possession of a firearm during a crime of violence, and one count each of armed assault with intent to rob, attempted robbery while armed, and carrying a pistol without a license. These charges arose out of three separate criminal incidents, all of which occurred on July 21, 1989 between 7:00 p.m. and 10:00 p.m. One of the victims, Daniel Hotz, was fatally shot during the final robbery that night. The trial court granted Kinard's unopposed motion to sever for trial the crimes arising out of the Hotz robbery and murder. The first trial for the crimes against Hotz resulted in a mistrial after Blair testified that he and Kinard decided to rob Hotz and another victim, Paula Zimmerman, "because that's all we was doing during that night."

At the second trial, the evidence disclosed that Kinard and Blair were friends and neighbors. They lived less than a block from Daniel Hotz' home at 209 Eleventh Street, N.E. Just prior to the robbery and murder, Kinard and Blair were sitting on a stoop across the street from Hotz' house. When Hotz drove up with Zimmerman and got out of the car, Kinard said, "Let's go rob the two people in the car." Kinard approached Hotz, and Blair approached Zimmerman. Each man was brandishing a weapon as they demanded the victims' wallets. Hotz resisted, and Kinard shot him twice. Zimmerman threw her wallet to the ground. Kinard announced that it was over and ran behind Hotz' car. Zimmerman saw Hotz grab his side, moan, and fall to the ground as she ran toward his house. Blair picked up Zimmerman's wallet and ran through an alley toward

2. We note, *sua sponte,* that a defendant may not be convicted of more than one murder of the same victim, as he was here. Therefore, we must remand to the trial court for resentencing and with instructions to vacate one of the two murder convictions. *See Cowan v. United States,* 629 A.2d 496, 497 (D.C.1993).

the back of his house where he expected to meet Kinard.

About four minutes after the incident, the two men met in the alley behind Blair's house and split the proceeds of the robbery. Kinard bragged to his accomplice about the killing. Kinard threw Zimmerman's wallet, which contained her credit cards and identification, onto the roof of the house next to Blair's. The wallet was found there two months later and turned over to the police. Blair's fifteen-year-old neighbor, Charles Kelly, testified that he saw Blair and Kinard in the alley about fifteen minutes before hearing emergency vehicles responding to the crime scene. Kelly said that he was making noises like a police siren and that Kinard warned him to be quiet. Blair testified that the encounter with Kelly occurred after the murder.

Although Zimmerman identified Blair and another person as her possible assailant, she failed to identify Kinard as the shooter when she viewed a line-up in which both Kinard and Blair stood less than a month after the crimes occurred.[3] During her trial testimony, Zimmerman explained that Kinard and another person in the line-up looked like the shooter, but she did not identify them because of her uncertainty and the fear of damaging her credibility with the police.[4] In March 1991, Zimmerman saw a photograph and videotape of the line-up during trial preparation, and she told the prosecutor she thought she could identify the shooter. She identified Kinard at that time, saying that she recognized him by his ears, his height, and thin build.

Carroll Bradshaw, one of Blair's neighbors, who had known Kinard for at least ten years, was sitting on his porch about a half block away from the crime scene when he heard what sounded like firecrackers and a woman's scream. Right after that, he saw Kinard, who was wearing "a dark outfit, like a sweatshirt with a hood on it," running up 11th Street toward C Street.[5] Anthony Brooks, another neighbor, heard an argument outside and shots fired, but he reached his front porch in time to see only Hotz lying in the street, one man running up 11th Street, and the leg of another individual disappearing into the alley.

According to Kinard's testimony, he was at home after 6:00 p.m. on the night of the offenses, and he went to meet his cousin after 9:00 p.m. at a school located at 13th Street and Constitution Avenue, N.E. During the ten-minute walk to the school, Kinard initially said he saw Blair and Kelly at the mouth of the alley behind Blair's house. He said he waited at the school for a while, and then walked back toward home after his cousin did not show up. According to Kinard, he then saw Blair and Blair's cousin, Henry James, robbing one of two strangers. Kinard testified that he saw a struggle and that he ran up 11th Street after hearing two shots fired. Thereafter, he said he went to Southeast with another cousin and remained there until 3:30 or 4:00 a.m.

On cross-examination, Kinard denied being with Blair at certain specified locations during the hours preceding the Hotz murder. Therefore, the prosecutor requested permission to introduce the testimony of the victims of the other robberies that night in order to impeach Kinard's testimony about his activities between 6:00 p.m. and 9:40 p.m., the nature of his relationship with Blair, and his testimony that he did not possess a gun that

---

3. Zimmerman had seen a sketch of Kinard's profile in the newspaper prior to the line-up.

4. Zimmerman explained that she picked two men because "there were two look-alikes for each person involved in the crime." She said that both of the men she picked "looked like the one on my side." She also stated that she thought two other men, Kinard being one, resembled the "shooter." When asked why she did not tell the police she thought she recognized all four men, she responded "there are only nine people in the lineup, and I felt like for me, at

least, it was more important to make sure that I got the one that was on my side, because I had a better memory of him, and I felt like if I chose four out of nine, it would look like I was choosing everybody, and who would believe me if I chose four people."

5. Blair and Zimmerman testified that Kinard was wearing a striped tee shirt. Blair said that Kinard also wore a baseball cap, but Zimmerman could not remember whether the shooter wore a cap or not.

evening.[6] Outside of the presence of the jury, the government presented the testimony of five robbery victims who were complaining witnesses in Kinard's other cases. The court found by clear and convincing evidence that Kinard had committed each of the robberies which the government sought to use as impeachment evidence. Nevertheless, to avoid the introduction of other crimes evidence, the court restricted the admissible evidence to stipulations of the testimony of these witnesses that they had seen Kinard with Blair at three separate locations at various times that evening, conversing with persons whom they did not know. The court also ruled that it would admit a stipulation that two witnesses, other than Blair, had seen Kinard about 9:30 p.m. that night in possession of a hand gun.[7] The court also ruled that the evidence of Kinard's possession of the gun could be admitted as both impeachment and substantive evidence.

When cross-examination resumed, contrary to his earlier testimony, Kinard admitted that he and Blair were more than casual acquaintances. After initially denying it, Kinard also admitted that he was with Blair at 9:30 p.m. in the 1000 block of Massachusetts Avenue, N.E. and then in the 300 block of 8th Street, N.E. at 8:30 p.m. and that Henry James was not with them. However, Kinard testified that he was with James rather than Blair on 10th Street, S.E. at 7:05 p.m. Kinard also admitted that at each location he approached one or two people he did not know and left the area rapidly after a brief

conversation with them. However, Kinard denied having a gun while with Blair on 11th Street where Hotz was murdered.

Kinard's lead counsel, Milton Lee, was hospitalized after the government had presented two rebuttal witnesses. The Director of the Public Defender Service (PDS), the agency which employed Lee at the time, entered an appearance on Kinard's behalf and twice requested a mistrial. Following a hearing on the competence of Kinard's second defense counsel, Deborah Harris, to proceed in Lee's absence, the court denied the motion. The court reasoned that although Harris represented that she was not focused on the testimony of some of the witnesses because of her other responsibilities during the trial, she was sufficiently absorbed in the proceeding to represent appellant competently.[8] The court observed that there is never a perfect situation where the lawyer can fully concentrate on every point. Since the Director of PDS was reluctant to proceed under the circumstances, the court appointed John Copacino to act as co-counsel for Kinard. The court recessed the trial for a week to allow Harris and Copacino time to obtain and review the transcripts of the testimony, and the trial resumed thereafter.

### B. Appellant's Post Trial Motion

Following the jury's verdict of guilty, but prior to sentencing, appellant filed a motion for new trial pursuant to Super.Ct.Crim.R. 33 based on a claim of ineffective assistance of counsel.[9] At the hearing on the motion,

6. Crimes involving two of the criminal episodes had been severed, while a third had been indicted separately.

7. The stipulation read in pertinent part as follows:

It has been agreed and stipulated between the parties as follows. Daniel Kinard was seen with a gun by two witnesses other than Shawn Blair on Friday, July 21st, 1989, within 10 minutes before the Hotz–Zimmerman incident that occurred on 11th Street, Northeast. Mr. Kinard spoke with one of these witnesses. It was dark outside and the block was lined with trees. The area where they stood, however, received some illumination from a street light across the street. Mr. Kinard stood within two feet of the witness. The witness observed Mr. Kinard holding a gun at Mr. Kinard's side. The witness, who had experience with and

knowledge of handguns, will testify that based upon his experience, the gun appeared to be a large caliber service revolver similar to a .38 caliber revolver. The witness never handled the weapon or its ammunition. The second witness also observed Mr. Kinard with a gun.

8. Ms. Harris testified that she was responsible for managing the documentary and other tangible evidence, answering appellant's questions during the course of the trial, and preparing for her next activity. Appellant contends that these activities distracted her at times, and thus, resulted in her constructive absence from the trial.

9. The rule provides in pertinent part as follows:

The Court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice.... A motion for a new trial

the defense called Ms. Harris and Mr. Lee as witnesses. Ms. Harris' testimony revealed that she took almost verbatim notes of the trial in order to confer with Lee and Kinard about the case. She further testified that she paid as much attention to the testimony of the witnesses as possible, given her other responsibilities at trial.

Lee represented Kinard in all of the pending cases. As to the counts involved in this case, Lee said Kinard was focusing on an alibi defense, consistent with what he told the police after his arrest.[10] Some time between the first and second trial, Kinard provided his attorney with a basis for a defense of innocent presence. Contrary to Kinard's statement to the police, it was his contention in this account that he had been at home that night until 9:00 p.m. when he walked to the school and back. Based upon the government's case, Lee said he thought it necessary to have Kinard take the stand. While Lee intended to start his examination of Kinard with what occurred when it became dark that evening, he said that he mistakenly started with what occurred at 6:00 p.m. Kinard's testimony, which Lee considered to be helpful in contradicting Blair's testimony about spending the day with Kinard, seemed to place Kinard at home after 6:00 p.m. Lee said that he did not think that Kinard's account of his walk to and from the school between 9:00 and 9:40 p.m. constituted a denial of his involvement in the robbery on Massachusetts Avenue at 9:30 p.m. Lee said if he had known that the testimony would open the door to impeachment evidence involving any other robbery, he would have handled the examination differently, or possibly not called Kinard to testify. The trial prosecutor testified at the hearing that her cross-examination would have been no differ-

ent even if Lee had commenced the examination with events beginning at 9:00 p.m.

Although the trial court found that Lee's overall performance was effective, it concluded that Lee had not thought through either the implications of having Kinard testify or of asking the questions which resulted in the court's ruling that evidence of Kinard's activities with Blair earlier that evening was admissible.[11] However, the court disposed of the motion on the basis of the prejudice prong of *Strickland*, concluding that the requisite showing of prejudice had not been made. *See* 466 U.S. at 694, 104 S.Ct. at 2068. Specifically, the trial court determined that there was no way for the defense to limit Kinard's testimony so as to preclude an inquiry about his whereabouts, his companion, or his possession of a gun on the night of the murder. The court concluded that the government's evidence of guilt was strong and that there was no reasonable probability of a different outcome if Kinard had not testified. The court also rejected Kinard's "absence of counsel" argument and denied the motion for new trial.

## II.

Kinard argues that his trial counsel committed an error on a clear point of law, so egregious that it deprived him of a fair trial, the result of which is not reliable. He contends that by inquiring into the character of his relationship with Blair, his whereabouts earlier on the evening of the murder, and whether he possessed a gun that day, his trial counsel opened the door to otherwise inadmissible other crimes evidence which was devastating to the defense. The government takes the position that any failure of defense counsel to appreciate the risks posed by Kinard's innocent presence defense does

based on the ground of newly discovered evidence may be made only before or within 2 years after final judgment, but if an appeal is pending, only on remand of the case may the Court grant the motion. A motion for new trial based on any other grounds shall be made within 7 days after verdict or finding of guilty or within such further time as the Court may fix during the 7–day period.

10. Appellant had told the police that he was in Southeast Washington with friends and a cousin

on the night of the murder from 5:30 p.m. until 3:30 or 4:30 a.m. the following morning.

11. It is appellant's contention that his trial counsel legally erred in asking him the following questions:

(1) "Now, how would you characterize your relationship with Shawn Blair"; (2) "Do you remember what you had done earlier [on July 21, 1989], say after six o'clock"; and (3) "Did you have a gun on July 21, 1989?"

not constitute a serious error and that there was no causal connection between the claimed error and the admissibility of the impeachment evidence. Rather, the government contends that it was Kinard's testimony about his presence at the scene of the crime which provided the basis for his impeachment with extrinsic evidence and that, in any event, there was no way to avoid the government's cross-examination without eliminating · the usefulness of Kinard's testimony. Moreover, the government argues, Kinard had never represented that he would have given up his right to testify or pursued any different course if he had known of the risks. We consider appellant's arguments which are essential to our disposition of the case in light of the controlling legal principles.

■ To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that his counsel's performance was deficient, which requires a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed that defendant by the Sixth Amendment." *Strickland, supra,* 466 U.S. at 687, 104 S.Ct. at 2064. The defendant must also show that counsel's deficiencies prejudiced the defense so as to deny the defendant a fair trial, the outcome of which is not reliable. *Id.* The failure to make either showing will defeat the motion. *Id.; Johnson v. United States,* 613 A.2d 888, 893 (D.C.1992). Thus, the court may be able to resolve the motion by examining only the prejudice component of the *Strickland* standard, as the trial court

did in this case. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *United States v. Horne,* 300 U.S.App.D.C. 169, 171, 987 F.2d 833, 835 (1993). Our review of Kinard's claims of error and the record persuade us that the ineffectiveness claim can be disposed of properly by focusing on the prejudice prong of the claim.

■ Kinard first argues that the admission of otherwise inadmissible other crimes evidence must be presumed to be prejudicial unless its admission is justified by some substantial, legitimate purpose. In support of this contention, Kinard relies upon the principles extracted from *Drew v. United States,* 118 U.S.App.D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964).[12] Since there is a substantial likelihood that other crimes evidence may be misused by a jury to infer a defendant's guilt of the crime for which the defendant is on trial, courts presume that such evidence is prejudicial and exclude it absent some substantial, legitimate purpose for its admission.[13] *Id.* at 15–16, 331 F.2d at 89–90. Kinard contends that none of the recognized exceptions to the *Drew* doctrine are present here, and therefore, prejudice should be presumed from the admission of the challenged evidence. The government responds that the evidence about which Kinard complains was not other crimes evidence. If inadmissible other crimes evidence is not involved, then Kinard's claim of presumptive prejudice by reason thereof must fail. Therefore, we consider this argument first.

**12.** The government contends that Kinard presents this theory for the first time on appeal, and therefore this court need not consider it. *See United States v. Porter,* 618 A.2d 629, 642 n. 24 (D.C.1992). We conclude that Kinard's argument was preserved adequately by his assertion in his motion for new trial that prejudice resulted because the challenged evidence provided a basis for the jury to infer that he and Blair spent the night committing armed robberies. Further, in the trial court, Kinard proffered in support of this argument the testimony of two jurors to explain their perception of the evidence in that way. We find no error in the trial court's exclusion of the jurors' testimony. We need not decide whether the general rule against calling jurors as witnesses to impeach their own verdict applies here to exclude the testimony. *See Khaalis v. United States,* 408 A.2d 313, 359 (D.C. 1979), *cert. denied,* 444 U.S. 1092, 100 S.Ct.

1059, 62 L.Ed.2d 781 (1980). For in this case, the jurors' actual perceptions are irrelevant to the determination of whether particular evidence falls within the purview of *Drew.* "[I]n order to be characterized as *Drew*-type evidence, the acts portrayed must be minimally in the nature of a criminal offense." *Wheeler v. United States,* 470 A.2d 761, 769 (D.C.1983). It is this rule which must guide our analysis.

**13.** Other crimes evidence is admissible when relevant to "(1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial." *Drew, supra,* 118 U.S.App.D.C. at 16, 331 F.2d at 90.

■ The government points out correctly, and Kinard conceded at argument, that evidence that he possessed a gun while in the area of the crimes just minutes before the shooting, without more, is not other crimes evidence subject to the strictures of *Drew.* *See Martin v. United States,* 606 A.2d 120, 123 (D.C.1991). Rather, such evidence may be admissible to prove that defendant had the means of committing the crime charged. *Id.; Ali v. United States,* 581 A.2d 368, 376 (D.C.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 259, 116 L.Ed.2d 213 (1991); *Coleman v. United States,* 379 A.2d 710, 712 (D.C. 1977). Thus, the trial court properly ruled that this evidence was admissible as substantive evidence of the crimes for which Kinard was on trial. *See Martin,* 606 A.2d at 132; *see also Ali,* 581 A.2d at 376.

■ The government also contends that the remaining evidence admitted as a result of defense counsel's questioning was not other crimes evidence either. This evidence was adduced on cross-examination of Kinard and by stipulation. It showed that during the approximately two hours preceding Hotz' murder, Kinard was seen with a gun and that Kinard and Blair approached three different groups of strangers on the street, spoke to them briefly, and left at a quick pace. Kinard contends that the only import of this evidence during an armed robbery trial would be that he and Blair were engaged in some criminal activity. Therefore, Kinard argues, that prejudice must be presumed from the admission of the evidence. The government responds that this evidence is not other crimes evidence because it is not "minimally in the nature of a criminal offense." *Wheeler, supra* note 12, 470 A.2d at 769.

Although Kinard's conduct during these street encounters might be viewed as suspect, the government's position finds support in prior decisions of this court. *See, e.g., Martin, supra,* 606 A.2d at 132 (defendant's possession of handgun not other crimes evidence); *Catlett v. United States,* 545 A.2d 1202, 1218 (D.C.1988) (testimony that defen-

dant watched witness' house until police left and appeared at his school not minimally in nature of obstruction of justice), *cert. denied,* 488 U.S. 1017, 109 S.Ct. 814, 102 L.Ed.2d 803 (1989); *Wheeler, supra* note 12, 470 A.2d at 769 (evidence defendant "rang doorbell, peered into windows, wandered between houses and bushes, posed as salesman and a workman, followed one woman, and gave an alias to an inquisitive police officer" not sufficiently "criminal" to come within *Drew's* prohibition).

*Wheeler* is particularly instructive. In *Wheeler,* the defendant was tried and convicted of sodomy, rape, first-degree burglary while armed, armed robbery, and assault while armed arising out of five separate incidents which all occurred in upper Northwest Washington. 470 A.2d at 763, 766. Over defense counsel's objection, witnesses who saw Wheeler in the same general area near the time of the crimes were permitted to testify about Wheeler's suspicious activities earlier that evening. *Id.* at 767–68. One police officer testified that Wheeler was seen following a woman from a bus and that later he was observed in some bushes between two houses. *Id.* Another officer testified that he saw Wheeler ringing doorbells, checking windows, and looking into driveways and garages and that Wheeler's explanation for his conduct was not satisfactory. We held in *Wheeler* that *Drew* was not controlling because such conduct was not "minimally in the nature of[ ] criminal offense[s]." *Wheeler,* 470 A.2d at 769.

Similarly, in this case the evidence of appellant's activities cannot be characterized as *Drew*-type evidence. Just as in *Wheeler* and *Catlett,* the challenged evidence here does not portray appellant committing any crime or engaging in any activities of a criminal nature. *See Wheeler, supra* note 12, 470 A.2d at 769. There was no suggestion that Kinard sought or obtained anything from the people he encountered. There was no evidence that Kinard acted in a threatening way toward the people with whom he spoke.[14] Therefore, we reject Kinard's argument that

---

14. The stipulation that two witnesses saw Kinard with a gun ten minutes before the Hotz–Zimmerman robberies and the murder is on a different

footing. As previously determined, it is probative evidence of the charged offenses. *See Martin, supra,* 606 A.2d at 132.

prejudice must be presumed, and we consider his argument that he was actually prejudiced as a result of the claimed deficiency in the performance of his counsel at trial.

### III.

■ To demonstrate prejudice under *Strickland,* a defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. at 2068. In this context, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Kinard argues that the trial court erred in concluding that there was no reasonable probability that the outcome would have been different had the deficiency it found in counsel's performance not occurred.[15] He contends that the court's conclusion is based upon two erroneous premises, namely, that (1) the scope of the cross-examination would have been the same even if Kinard had limited his exculpatory testimony, and (2) the remaining evidence would have been sufficient to convict him even if appellant had not testified.[16] We reject each of these arguments.

■ First, Kinard contends that by restricting his direct testimony to only the events beginning at the time of the shooting, he could have denied his own involvement and testified that he was at the crime scene where he observed Henry James commit the offenses with Blair's assistance without opening the door to other crimes evidence. Kinard's legal position is that a defendant is free to deny the elements of the crimes charged without being subject to impeachment with evidence otherwise inadmissible in the government's case-in-chief. *See Walder v. United States,* 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L.Ed. 503 (1954).

Indeed, although in a different context, the Supreme Court held in *Walder* that

> the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief.

347 U.S. at 65, 74 S.Ct. at 356.[17] Even assuming the applicability of the foregoing

---

15. The trial court found that Mr. Lee's overall performance at trial was effective, a finding amply supported by the record. However, the court also found essentially the following described deficiency in counsel's performance:

> [Lee] did not fully think through the implications of asking [Kinard] the door-opening questions, nor, in fact, the implications of having Kinard testify at all. Thus, he did not call to mind, or investigate to discover, the law that permitted introduction of the impeachment evidence, even though it carried with it evidence of other crimes.

The court did not resolve whether this deficiency was "so serious that [Mr. Lee] was not acting as the 'counsel' guaranteed by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Rather, the court resolved the motion under the prejudice prong of *Strickland.*

16. Preliminarily, the government argues that Kinard failed to establish in the trial court the factual predicate for these arguments. Specifically, the government contends that Kinard never established as a matter of fact that Lee failed to inform him of the impeachment consequences of his direct testimony or that he would have done anything differently if he had been so informed. The record reflects that it was Lee who suggested and thought it necessary that Kinard testify and that Kinard did not insist on doing so.

In his affidavit, defense counsel also indicated that it was his decision to ask Kinard about his whereabouts on the night of the crimes and whether he had a gun. The record adequately supports the trial court's findings that the attorney did not think through the consequences of his decision in this regard and that counsel's advice would have been different if he had done so.

17. It must be recognized that the exclusionary rule cases and the exceptions to the rule involve the use of evidence which has been determined to be unconstitutionally obtained. Therefore, the rules developed for its exclusion have involved the policy consideration of deterring police misconduct. *United States v. Leon,* 468 U.S. 897, 916, 104 S.Ct. 3405, 3417, 82 L.Ed.2d 677 (1984); *United States v. Havens,* 446 U.S. 620, 626–27, 100 S.Ct. 1912, 1916, 64 L.Ed.2d 559 (1980). In considering the propriety of the admission of other crimes evidence, the same policy considerations and purposes are not present. Rather, the concern with other crimes evidence focuses necessarily upon the relevance and importance of the evidence when weighed against its prejudicial effect. *See Drew, supra,* 118 U.S.App.D.C. at 16, 331 F.2d at 90. In order to assure a fair trial and to avoid potential prejudice by the improper use of such evidence, gen-

principle to evidence legally obtained, pertinent to our consideration is the exception which the Supreme Court set out in the same passage in *Walder* as follows:

> [b]eyond that, however, there is hardly justification for letting a defendant affirmatively resort to perjurious testimony in reliance on the government's disability to challenge his credibility.

*Id.* Thus, the exception to the rule allows the government to expose any perjury by using the otherwise inadmissible evidence for impeachment purposes. *Id.* Recently, the Supreme Court explained that the exception leaves defendants free to offer probative and exculpatory evidence through their own *truthful* testimony. *James v. Illinois,* 493 U.S. 307, 314, 110 S.Ct. 648, 652, 107 L.Ed.2d 676 (1990). Thus, while the rule allows a defendant to deny the elements of the case without permitting the government to introduce rebuttal evidence which is otherwise inadmissible,[18] a defendant may not resort to false statements with impunity in reliance on the government's inability to introduce the evidence to challenge his credibility. *Walder, supra,* 347 U.S. at 65, 74 S.Ct. at 356.

 Here, the effectiveness of Kinard's innocent presence defense depended upon his denial of possession of a gun while at the scene of the crimes and his disassociation from Blair, the other assailant, or at the very least his creation of that impression. As the trial court concluded, such testimony would have led inevitably to a ruling permitting the government to introduce evidence that Kinard possessed a gun and had been with Blair just five to ten minutes before the shooting. The prosecutor may cross-examine not only about the facts asserted by a defendant in testimony, but may also ask questions reasonably related to the inferences to be drawn from the direct testimony.

*United States v. Raper,* 219 U.S.App.D.C. 243, 248, 676 F.2d 841, 846 (1982). Thus, once Kinard testified that he was on the scene while denying involvement, the prosecutor could have explored the circumstances surrounding the crime and Kinard's involvement in it. *See Wesley v. United States,* 547 A.2d 1022, 1025 (D.C.1988); *Mathews v. United States,* 539 A.2d 1092, 1093 (D.C. 1988). Kinard's denial of his association with Blair or the possession of the weapon would have provided the basis for introduction of the challenged evidence. *See Walder, supra,* 347 U.S. at 65, 74 S.Ct. at 356; *James, supra,* 493 U.S. at 314, 110 S.Ct. at 652. Therefore, any claim of actual prejudice from his counsel's failure to restrict the scope of the questioning to innocent presence must fail.

 Assuming that but for the asserted legal error of trial counsel, he would have advised Kinard against taking the stand, the requisite showing of prejudice under *Strickland* was still not satisfied, as the trial court found. The trial court concluded that the government's evidence in its case-in-chief was strong and that the verdict based on that evidence alone would not be unreliable nor cause the court to lack confidence in the outcome. Kinard argues that the trial court erred in its conclusion that the evidence was strong, and consequently in its determination that prejudice under *Strickland* had not been shown.

 In determining whether there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different, the court must consider the totality of the evidence. *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. at 2068. Applying that standard, we agree with the trial court that Kinard has not made the requisite showing. If Kinard had not

---

erally the evidence is held to be inadmissible except when there are substantial and legitimate purposes for its use. *Id.* We have recognized that while *Drew* restricts the introduction of prior crimes against an accused as substantive evidence, such evidence may be used for the limited purpose of impeachment. *See Samuels v. United States,* 605 A.2d 596, 597 (D.C.1992); *see also Sherer v. United States,* 470 A.2d 732, 738 (D.C. 1983). Even though such evidence might be potentially quite prejudicial, the trial court may

properly conclude that it is admissible where an appellant seeks to create a misleading impression in anticipation of being shielded by the rule excluding other crimes evidence. *See Samuels,* 605 A.2d at 599.

**18.** In the context of *James* and *Walder,* the evidence is inadmissible in the first instance because illegally seized.

testified, there would still have been before the jury strong evidence of his guilt. This evidence included, *inter alia*, the following: (1) Blair's testimony describing the crimes and Kinard's role in them, including that Kinard shot Hotz; (2) Zimmerman's testimony identifying Kinard as the shooter and describing the circumstances of the crimes, which corroborated in some detail Blair's testimony; (3) the testimony of Carroll Bradshaw, a neutral witness, that he saw Kinard fleeing the scene shortly after the shots were fired; and (4) Charles Kelly's testimony that he saw Blair and Kinard together in the alley behind Blair's house shortly before hearing emergency vehicles responding to the crime scene. While Kinard points to some individual weaknesses in the testimony of the government's witnesses, particularly that of Zimmerman and Blair, this argument fails to take into account the strength of the evidence formed by the mesh of the testimony of all of the witnesses who corroborated each other on the critical issue of Kinard's involvement in the crimes. A review of the record persuades us that the outcome would have been no different had Kinard not testified and that the proceeding was fundamentally fair and the result reliable. *See Lockhart v. Fretwell*, —— U.S. ——, ——, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993); *Strickland, supra*, 466 U.S. at 694, 104 S.Ct. at 2068.

### IV.

■ Finally, Kinard argues that the constructive or actual absence of Ms. Harris and Mr. Copacino at various stages of the proceedings requires a finding of prejudice as a matter of law. Essentially, Kinard contends that prejudice must be legally presumed because the circumstances of this case involve actual or constructive denial of the assistance of counsel rather than simply the ineffective assistance of counsel who was present. In support of this position, Kinard relies upon *Green v. Arn*, 809 F.2d 1257 (6th Cir.1987). In *Arn*, the court held that the two-pronged *Strickland* test is inappropriate where the issue is the denial of the assistance of counsel rather than a claim that counsel was present but ineffective. *Arn, supra*, 809 F.2d at 1262. Kinard urges application of the principle extracted from *Arn* because of evidence that his co-counsel, Harris, was inattentive at times during the course of the trial.

The rule from *Arn* has been used in cases where counsel has been prevented from assisting the accused during a critical stage of the trial or where counsel was totally absent. *See United States v. Cronic*, 466 U.S. 648, 659 n. 25, 104 S.Ct. 2039, 2047 n. 25, 80 L.Ed.2d 657 (1984); *see also Siverson v. O'Leary*, 764 F.2d 1208, 1215 (7th Cir.1985) (counsel physically absent); *Javor v. United States*, 724 F.2d 831, 834 (9th Cir.1984) (prejudice presumed when counsel asleep during substantial period at trial); *State v. Keller*, 57 N.D. 645, 223 N.W. 698, 699, (1929) (prejudice presumed when counsel intoxicated during the entire trial). These cases have not yet extended the rule to cover every time that counsel, although present, may be distracted during the trial.

In this case the trial court found, and Kinard does not challenge, that Harris was alert at all times and that she devoted her exclusive attention to trial responsibilities, even though she was unable to focus on all of the testimony. As the trial court observed in rejecting Kinard's argument, Harris' testimony that she was distracted at times recounts circumstances not unlike those encountered by lawyers who must try a case without assistance, and the testimony does not show that she was absent. We agree. Moreover, Harris had a full opportunity to review the transcripts, along with newly appointed counsel, when the trial court recessed the case for seven days for that purpose. Here, Kinard was represented at all times by at least two attorneys, and not one of them was absent at any time in the sense described in the cases upon which he relies. Moreover, at least one of Kinard's attorneys was fully focused on the trial at every phase.

The rationale for presuming prejudice where counsel is absent at critical stages of the proceedings is that meaningful adversarial testing of the government's case would be eliminated. *See Cronic, supra*, 466 U.S. at 659, 104 S.Ct. at 2047. In this case, it is clear that Kinard at all times had attorneys who were attentively and diligently applying themselves to protect his interest throughout

the course of the trial and that they put the prosecution's case through "the crucible of meaningful adversarial testing." *See id.*, 466 U.S. at 656, 104 S.Ct. at 2045.[19] There is no basis for a presumption of ineffectiveness under these circumstances. *Id.* at 661–65, 104 S.Ct. at 2048–50.

For the foregoing reasons, the case is remanded to the trial court for resentencing with instructions to vacate one of Kinard's two murder convictions.[20] In all other re-

spects, the judgments of conviction appealed from hereby are

*Affirmed.*

---

**19.** We agree with the trial court that Ms. Harris' representation was within the "wide range of reasonably professional assistance" required under *Strickland, supra,* 466 U.S. at 689, 104 S.Ct. at 2065.

**20.** *See* footnote 2, *ante.*