*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CF-999

CHRISTIAN ROMERO, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-10129-16)

(Hon. Juliet McKenna, Trial Judge)

(Submitted April 2, 2020                    Decided January 6, 2022)

*Gregory M. Lipper* was on the brief, for appellant.

*Bryan H. Han*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman* and *Christian Natiello*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, EASTERLY, and MCLEESE, *Associate Judges*.

GLICKMAN, *Associate Judge*: Christian Romero appeals his conviction by a jury of second-degree murder while armed.[1] The charge arose from an incident,

---

[1] D.C. Code §§ 22-2103, -4502 (2012 Repl. & 2021 Supp.).

captured in video camera footage shown at trial, in which Mr. Romero got into a street fight with two strangers and stabbed one of them to death. Mr. Romero contends his conviction must be reversed because the trial court allowed the government to cross-examine him about facts underlying a prior assault conviction, to the limited extent of eliciting that he had stabbed the victim in that case multiple times with a knife. The trial court ruled that Mr. Romero opened the door to this evidence by claiming, in his direct examination, that he "would never" intend to kill someone, and the court instructed the jury to consider the prior stabbing only for the proper purpose of assessing Mr. Romero's credibility. We find no abuse of discretion, uphold the court's ruling, and affirm appellant's conviction.

## I.

The government sought to prove at trial that on the night of April 23, 2016, appellant confronted Dimas Fuentes-Lazo and Mario Rosales after they saw him break a side mirror on Rosales's parked car in the 800 block of Kennedy Street, N.W. The government charged that before Rosales could call the police, appellant lunged at him with a knife and then turned on and fatally stabbed Fuentes-Lazo.

Prior to trial in this case, the government informed appellant's counsel by letter that it expected to have certified copies of his 2013 conviction for first-degree

assault in Maryland and the transcript of the hearing at which appellant pled guilty to that offense. In that case, the letter stated, appellant stabbed a man nine times with a knife, including three times in the neck and one time in the back, causing a punctured lung and other serious injuries. The government advised the defense that it did not intend to use appellant's Maryland conviction or guilty plea in its case-in-chief, but that it reserved the right to use that evidence "for purposes such as, but not limited to, impeaching Defendant should he testify or to rebut any suggestion by the defense (in its opening statement, questioning of witnesses, or otherwise) that Defendant did not know (or should not have known) that stabbing someone could cause an extreme risk of death or serious bodily harm."

At trial, the government's case-in-chief included the eyewitness testimony of Mario Rosales and of a security worker from a nearby restaurant who witnessed the killing; security camera footage from nearby businesses; and physical evidence including DNA profiles obtained from a knife and a Coca-Cola bottle found at the crime scene.

Mr. Rosales testified that he and Dimas Fuentes-Lazo, lifelong friends, drove to Kennedy Street to go to a restaurant. Rosales parked his car in the 800 block and the two friends got out and crossed the street. They stood on the sidewalk there

while Rosales took a phone call. He was still on the phone when he heard a noise, turned toward the street, and saw appellant breaking the mirror of his car. Rosales testified that he confronted appellant, saying, "Hey that is my car."

Appellant responded with profanities, walked toward Rosales and Fuentes-Lazo, and threw a Coca-Cola bottle at them. Appellant then asked if the men wanted to fight. Rosales told appellant he was going to call the police. Accompanied by Fuentes-Lazo, Rosales went back across the street to his car to make the call from there. As he did this, he tried to push the car alarm button on his car key, and accidentally opened his trunk instead. Appellant, wielding a knife, "launch[ed] himself" at Rosales. Rosales kicked back at appellant, who bent over from the impact. Appellant then straightened up, turned to attack Fuentes-Lazo, and stabbed him several times before Rosales could come to his friend's aid. Appellant then dropped the knife and ran away.

Eduardo Videz, who was working as a "bouncer" at a restaurant in the 800 block of Kennedy Street, testified that he saw the fight. He did not know any of the men involved in it. Mr. Videz testified that appellant was holding the knife in his hand when he straightened up after Rosales kicked him. Video footage from store security cameras in the vicinity also showed the fight from its inception to

appellant's flight. The video footage was consistent with the witnesses' accounts, though it was not clear enough to show where the knife came from or whether appellant was the first to arm himself in the fight.[2]

Appellant testified that he acted in self-defense. He said he had gone to Kennedy Street that night to meet someone, had gotten lost, and was walking down the street looking for his destination when Rosales and Fuentes-Lazo called him over and Rosales accused him of hitting his car. Appellant admitted he had been drinking prior to the altercation and testified he "might have" damaged the car but did not remember doing so. Appellant said he tried to calm the two men down, but when Rosales opened the trunk of his car, appellant feared he was going to pull out a weapon. Then, appellant testified, he saw Fuentes-Lazo holding a knife. The rest of the incident, he said, "happened so quick" — he "got hit" by Rosales and knocked to the ground; he simultaneously knocked the knife from Fuentes-Lazo's hand; and he picked the knife up and "just reacted" to save his own life by fighting with and stabbing Fuentes-Lazo before fleeing.

---

[2] DNA analysis of the knife and the Coca-Cola bottle recovered from the scene by the police showed the following. Blood on the knife contained a complete, single-source DNA profile that matched that of Fuentes-Lazo. Swabs of the knife handle and blade also contained partial DNA profiles, from which appellant could not be excluded. Swabs from the Coca-Cola bottle contained a complete, single-source DNA profile that matched appellant.

6

In his direct examination, appellant acknowledged his prior assault conviction in Maryland. Defense counsel then asked appellant a series of questions regarding his intentions on the night of the stabbing, including:

> Q: During this event, between the time when you were at the trunk of the car until, as you say, you were on the ground, did you ever form an intent, a plan in your mind to hurt somebody?
>
> A: No.
>
> Q: Did you ever form an intent or plan in your mind to kill somebody?
>
> A: No, no, I would never do that.

This answer was followed by more questions of a similar nature, to each of which appellant responded in the negative.[3]

---

[3] As follows:

> Q: When you came into the District of Columbia that night was it your intent to harm or kill anybody?
>
> A: No.
>
> Q: When you got involved in that fight when they first called out to you, was it your intention to harm or kill anybody?
>
> A: No.

At the close of appellant's direct examination, the prosecutor asked for a bench conference, in which he asserted that appellant had "brought his character into issue" by testifying he "would never do anything like that." Therefore, the prosecutor argued, appellant had "opened the door" for the government to "attack that character" by impeaching appellant with the facts of his Maryland assault that showed he actually had done "something like that."

Defense counsel objected that "get[ting] into the details" of that conviction would go "beyond the purpose" of impeachment with a prior conviction, and that the government could sufficiently impeach appellant by re-eliciting the fact of his prior conviction and that it was for a first-degree assault. The court agreed with the government, however, explaining that:

> the Government is seeking to impeach not just [appellant's] general character or credibility [with] a prior conviction, but [also] the assertion he never would have done something like that, namely stabbing another individual intentionally with a knife.

---

> Q: When you were standing at your [*sic*] trunk was it your intention to harm or kill anybody?
>
> A: No.

Because appellant's Maryland first-degree assault conviction "in and of itself" did not reveal that he used a knife, the court permitted the government to elicit that fact from appellant but admonished the prosecutor not to "dwell" on it. The court limited the cross-examination to "[j]ust simply the nature of the prior conviction and the fact there was a knife involved." Explaining that he would refrain from objecting during the government's cross-examination in order not to highlight it, defense counsel reiterated his objection to the court's ruling. The court agreed that the objection was "noted for the record."

The government then began its cross-examination:

> Q: Mr. Romero, you mentioned on direct that you had a prior conviction for first degree assault in Maryland from 2013, right?
>
> A: Yes, that is correct.
>
> Q: You also said that when you were asked the question of would you ever, did you ever mean to harm anyone here, your answer was no, I would never do that, right?
>
> A: Yes.
>
> Q: That's not true, is it? The 2013 case involved your stabbing someone multiple times, didn't it?
>
> A: No, I don't remember the question.

Q:      Did the case involve you stabbing someone multiple times or not? That's the only question I have for you right now.

A:      Yes.

The cross-examination then turned to other matters.

Before closing arguments and the court's final charge to the jury, the parties and the court discussed whether the jury should receive a specific instruction to consider the prior stabbing testimony only for impeachment purposes and not as propensity evidence.   Defense counsel preferred that the court give only the "standard instruction" regarding impeachment by prior conviction, so as not to "highlight" again the similarities between the two crimes.  Acceding to appellant's wishes, the court instructed the jury that appellant's

> prior conviction is admitted into evidence solely for your consideration in evaluating his credibility as a witness. The evidence that he was convicted of a crime in the past is not evidence that Christian Romero is guilty of the offense charged in this case, and you must not draw such an inference.

In addition, the court warned the prosecutor against referring to appellant's prior assault conviction and its nature in closing argument.[4] So warned, the prosecutor did not mention the underlying facts of appellant's conviction to the jury, but he did tell the jury that "[w]hen deciding credibility of the defendant you can take into account his prior conviction and only for that reason can you use that prior conviction."

The jury expressed a need for more guidance from the court on this subject, however. On the morning of the first day of its deliberations, the jury sent a note to the court asking, "May we consider the nature of Christian Romero's prior

---

[4] The court stated:

> It [the prior stabbing] was directly impeaching of the statement that he made, which is why I allowed the Government to pose one limited question with respect to that. But . . . I would be concerned about highlighting that fact in your closing given the similar nature of the convicted offense and the crime with which he's currently charged. . . . The Government's whole closing argument is going to be to the point that Mr. Romero was not acting in self-defense, and so to make any reference to the prior conviction and the nature of the prior conviction runs too great of a risk that the jury would be considering that as propensity evidence. . . . So you're going to delete that and not make reference to that.

The prosecutor agreed to adhere to the court's directive.

conviction as establishing (or not) a pattern of behavior, or only to interpret his credibility/testimony?"  With the parties' approval, the court sent the following response to the jury:

> Mr. Romero's prior conviction is admitted into evidence solely for your consideration in evaluating Mr. Romero's credibility as a witness.  You may not consider the prior conviction as establishing a pattern of behavior.  The evidence that he was convicted of a crime in the past is not evidence that Christian Romero is guilty of the offense charged in this case and you must not draw such an inference.

The following morning, the jury convicted appellant of second-degree murder while armed.

## II.

Appellant contends the trial court abused its discretion in allowing the jury to learn his Maryland assault conviction was for a stabbing.  Appellant makes two main points.

First, he denies he said anything on direct examination that justified his impeachment with the facts underlying his prior assault conviction.  Appellant argues that the court and the government mischaracterized his statement that he

"would never do that." This statement was a response to a specific question asking whether he ever intended or planned to kill somebody. His denial that he would ever do *that* was only an assertion that he would never intentionally *kill* someone; it was not, he claims, equivalent to what the court and the prosecutor said it was, namely a broad assertion that he would never intentionally stab or harm another person. And because his Maryland conviction was for first-degree assault, not attempted murder, appellant argues the prior stabbing did not contradict his declaration that he would never intentionally kill someone. Appellant also argues that the question to which he responded was one of a series of questions that (otherwise) focused explicitly on his state of mind *on the night* he fought with Rosales and Fuentes-Lazo. Appellant claims his response, properly understood in that context, was only an assertion as to what he "would never" have done on that specific night.

Second, appellant contends, even if his statement could be said to have opened the door to impeachment with the fact that he stabbed the victim of his prior assault multiple times, the court still should have precluded the prosecutor from eliciting that fact on cross-examination because it was substantially more prejudicial than probative. There was too great a risk, appellant argues, that the jury would use the prior stabbing as proof of his propensity for violence — a risk confirmed by the

jury's note inquiring whether it could consider the prior stabbing as evidence of a "pattern of behavior."

The government argues that appellant did not so "finely parse" his testimony, and that its cross-examination was proper — under the doctrine of curative admissibility — to correct the false and misleading impression appellant conveyed that he was not the kind of person who could have committed the homicide for which he was on trial. In addition, the government argues, appellant essentially conceded at trial that he had opened the door to cross-examination regarding the nature of his Maryland offense, and that we therefore should review his claim only for plain error.

We turn first to the question of our standard of review. We think appellant did forfeit his claim that the trial court misconstrued his testimony that he "would never do that." At trial, appellant did not object at any point to the court's expressed understanding of his statement as denying he would ever intend to stab another person with a knife (as opposed to a denial that he would intend to kill someone, or an assertion limited to his mental state on one particular night). [5] Nor did appellant

---

[5] When the court observed that, "the Government is seeking to impeach not just [appellant's] general character or credibility [with his] prior conviction, but the assertion he never would have done something like that, namely stabbing another

argue for an alternative, narrower understanding of what he said. His claim that the court misconstrued the import of his testimony is subject, therefore, to review only for plain error.[6]

"Under the established four-part test for plain error, an appellant must demonstrate . . . that the error was . . . 'so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object.'"[7] Appellant has not made that showing. His explanation of what he meant by saying "I would never do that" is not implausible, in our view. The fact remains, however, that none of the participants in appellant's trial were privy to that explanation, and their understanding also was plausible and was not disputed. The

---

individual intentionally with a knife," appellant's counsel responded, "They can do that by eliciting the conviction."

[6] *See (Marcel) Johnson v. United States*, 26 A.3d 758, 762 (D.C. 2011) ("To avoid the plain error standard on appeal, a trial court must be 'fairly apprised as to the questions on which she was being asked to rule.'" (alterations omitted) (quoting *Tindle v. United States*, 778 A.2d 1077, 1082 (D.C. 2001))); *Hunter v. United States*, 606 A.2d 139, 144 (D.C. 1992) ("Objections must be made with reasonable specificity; the judge must be fairly apprised as to the question on which he is being asked to rule. '[P]oints not asserted with sufficient precision to indicate distinctly the party's thesis will normally be spurned on appeal.'" (quoting *Miller v. Avirom*, 384 F.2d 319, 321-22 (D.C. Cir. 1967))).

[7] *Comford v. United States*, 947 A.2d 1181, 1189 (D.C. 2008) (quoting *Thomas v. United States*, 914 A.2d 1, 20 (D.C. 2006)).

statement itself was categorical and not limited to his state of mind on a specific occasion, and it came amidst a series of questions variously asking appellant whether he intended to "hurt," "harm," or "kill" anyone. If the court did err in interpreting what appellant said as denying he would ever intend to stab someone with a knife, we cannot say the error was "obvious."

Nonetheless, appellant preserved his objection to being cross-examined about the facts underlying his Maryland assault conviction to contradict his testimony that he "would never do that." Defense counsel argued that "get[ting] into the details" of his Maryland assault would go "beyond the purpose" of impeachment with a prior conviction. In response to the argument that appellant's testimony had opened the door to cross-examination about those details, defense counsel contended that it would be sufficient for the government just to re-elicit appellant's conviction for assault. He reiterated his objection after the court disagreed and allowed the government to elicit from appellant the fact that his Maryland conviction arose from a stabbing. We are satisfied that appellant fairly apprised the court that he disputed the adequacy of the justification for invoking the doctrine of curative admissibility,

and the court clearly understood that was the issue before it. We therefore review the trial court's ruling for abuse of discretion.[8]

Appellant's first-degree assault conviction itself was admissible for the limited purpose of impeaching his general credibility as a witness.[9] Evidence of appellant's criminal conduct *underlying* that conviction was presumptively inadmissible, however. "It is fundamental that evidence of prior bad acts independent of the crimes charged is inadmissible to show the defendant's disposition or propensity to commit the charged offenses, from which the jury improperly could infer the defendant actually did commit them."[10] Such evidence "is excluded unless there is some 'substantial, legitimate purpose' for admitting it."[11]

The doctrine of curative admissibility may supply a valid justification for admitting otherwise inadmissible evidence of a defendant's unrelated criminal

---

[8] *Goines v. United States*, 905 A.2d 795, 799 (D.C. 2006).

[9] D.C. Code § 14-305(b)(1) (2012 Repl.).

[10] *Harrison v. United States*, 30 A.3d 169, 176 (D.C. 2011).

[11] *Goines*, 905 A.2d at 800 (quoting *Drew v. United States*, 331 F.2d 85, 90 (D.C. Cir. 1964)); *see also, e.g.*, *Pitt v. United States*, 220 A.3d 951, 964 (D.C. 2019) (explaining that "other crimes evidence is precluded when its relevance 'depend[s] wholly or primarily on the jury inferring' that the defendant was 'predisposed or had a propensity to commit the charged crimes'" (quoting *Harrison*, 30 A.3d at 178)).

conduct. Under this doctrine, a defendant may "open the door" to the use of that evidence for the non-propensity purpose of discrediting or rebutting testimony given by the defendant on direct examination. There is, we have said, "a rule of evidential parity: once the defendant opens the door to a specific issue, the government has the right to respond with contrary evidence on the same issue. Thus, . . . if a defendant introduces evidence of her own good character, the government can rebut with evidence of her bad character."[12]

"[T]he evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a

---

[12] *Johns v. United States*, 434 A.2d 463, 469 (D.C. 1981). This rebuttal may include evidence of the defendant's "specific acts." *Id.* at 468. *See, e.g.*, *State v. Taylor*, 649 A.2d 375, 377 (N.H. 1994) (holding that trial court did not abuse its discretion by allowing the prosecution to show that a defendant, who was charged with sexual assault on a young girl, "was lying when he volunteered on direct examination that he would never sexually abuse (and implicitly had never abused) a child," by admitting women's testimony that the defendant had sexually assaulted them as children). "The prosecutor may cross-examine not only about the facts asserted by a defendant in testimony, but may also ask questions reasonably related to the inferences to be drawn from the direct testimony." *Kinard v. United States*, 635 A.2d 1297, 1306 (D.C. 1993). *See, e.g.*, *Flores v. United States*, 769 A.2d 126, 131-32 (D.C. 2000) (in trial for possession with intent to distribute a controlled substance, defendant's claim that he was in an area known for drug dealing on an errand opened the door to the government's admission of the fact that the defendant had tested positive for drugs after his arrest).

great degree of deference to its decision."[13] Nonetheless, "judges are enjoined to exercise caution and restraint before relying on the curative admissibility rationale" as it is "'dangerously prone to overuse,' and the idea that the one side might 'open the door,' is often oversimplified."[14] Generally speaking, the "introduction of otherwise inadmissible evidence under shield of this doctrine is permitted only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence."[15] We have emphasized that "[o]pening the door is one thing[,] [b]ut what comes through the door is another. Everything cannot come through the door."[16] Before allowing otherwise inadmissible evidence to be heard under the curative admissibility doctrine, trial courts are "required to determine if its probative value [is] substantially outweighed by the danger of unfair

---

[13] *(William) Johnson v. United States*, 683 A.2d 1087, 1095 (D.C. 1996) (en banc).

[14] *Furr v. United States*, 157 A.3d 1245, 1252 (D.C. 2017) (quoting *Mercer v. United States*, 724 A.2d 1176, 1192 (D.C. 1999)).

[15] *Id.* (cleaned up); *see, e.g.*, *Lampkins v. United States*, 515 A.2d 428, 431 (D.C. 1986) (explaining that the curative admissibility doctrine "operates to prevent an accused from successfully gaining exclusion of inadmissible prosecution evidence and then extracting selected pieces of this evidence for his own advantage, without the Government's being able to place them in their proper context" (quoting *United States v. Winston*, 447 F.2d 1236, 1240-41 (D.C. Cir. 1971))).

[16] *Mercer*, 724 A.2d at 1192 (quoting *Winston*, 447 F.2d at 1240).

prejudice"[17] and should "consider the availability of alternative methods or evidence that can prove the same proposition in a manner that is less unfairly prejudicial to the defendant."[18] "More specifically," in a case like this one, "exclusion is required when anticipated prejudice to the defendant from the jury's likely inference of criminal propensity exceeds the probative value for reaching the truth through impeachment of the defendant's testimony with evidence of another crime committed by that defendant."[19]

In the present case, appellant's counsel asked him on direct examination, "Did you ever form an intent or plan in your mind to kill somebody?" Appellant answered, "No, no, I would never do that." As we have discussed, this answer can be construed more or less broadly. At a minimum, it was a declaration by appellant

---

[17] *Goines*, 806 A.2d at 801 (internal quotation marks omitted); *see generally Johnson*, 683 A.2d at 1099 (adopting Federal Rule of Evidence 403 and holding that relevant evidence may be excluded if its probative value is substantially outweighed by unfair prejudice). The term "unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Mercer*, 724 A.2d at 1184 (quoting Fed. R. Evid. 403 advisory committee's note); *see also Old Chief v. United States*, 519 U.S. 172, 180 (1997) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.").

[18] *Mercer*, 724 A.2d at 1185.

[19] *Pitt*, 220 A.3d at 960.

that he had never intended and "would never" intend to kill another person. Whether appellant realized it or not, this declaration put his character in issue in order to bolster his self-defense claim. Appellant implicitly relied on the government's presumptive inability to rebut his assertion of good character with the otherwise inadmissible evidence of his prior bad acts. Under our law, this was a prototypical example of door-opening. The government had good reason not to want appellant's declaration to go unanswered.

Appellant makes no real argument to the contrary. His claim that the door was not opened to evidence of his prior intentional stabbing is premised on the proposition that the earlier stabbing did not counter his assertion that he would never intend to kill somebody.

We disagree with that proposition. The fact the government elicited, that three years earlier appellant had stabbed a person multiple times, gives rise to the inference that, in that incident, he *did* intend to kill somebody.[20] The specifics of the assault

---

[20] *See McKnight v. United States*, 102 A.3d 284, 287-88 (D.C. 2014) (*mens rea* for second-degree murder may be "inferred from a defendant's actions"); *Wilson v. United States*, 711 A.2d 75, 76-77 (D.C. 1998) (evidence sufficient to affirm conviction for second-degree murder where defendant stabbed victim multiple times).

known to the trial court (and not disputed by appellant) amply supported its decision to allow the cross-examination and enable the jury to fairly draw the inference of a homicidal state of mind: appellant stabbed the victim nine times, including three times in the neck and one time in the back, and punctured the victim's lung.

We are satisfied that the court appropriately concluded that the probative value of the limited inquiry it allowed was not substantially outweighed by the danger of unfair prejudice, and that the court properly took measures to avoid unfair prejudice to appellant.

The court considered and rejected appellant's only proposed alternative, which was simply that the government could highlight on cross-examination the bare fact of his Maryland first-degree assault conviction (something the jury already knew). The court concluded, and we agree, that this proposal would have done nothing to undermine his testimony that he "would never" intend to kill; only the facts underlying the conviction would have responded to that claim with adequate concreteness. In a case that turned in large part on whether the jury believed appellant's claim of self-defense, we are persuaded that allowing some evidence that was directly impeaching appellant's truthfulness on this point "promised more than

enough of a contribution to the cause of truth to outweigh the attendant risk[]"[21] that the jury would draw an improper propensity inference, a risk the trial court significantly minimized in three ways.[22]

First, the court curtailed the extent to which the government could cross-examine appellant about the facts underlying his Maryland assault conviction. The government was able to elicit only that appellant stabbed the victim in that assault multiple times with a knife.[23] The jury did not hear the gruesome details of the

---

[21] *(Rudolph) Johnson v. United States*, 373 A.2d 596, 599 (D.C. 1977).

[22] Appellant now suggests that the trial court could have considered another remedy in lieu of allowing the government to bring out the facts of his prior conviction. He argues that striking his answer and directing the jury to disregard it would have sufficed to eliminate any prejudice to the government and would have caused him none. But appellant never proposed to the trial court that it strike his testimony; nor did the government. Whether appellant would have agreed to or opposed such a remedy had it been suggested is unknown.

[23] By eliciting that appellant had stabbed the victim "multiple times," the prosecutor exceeded the literal limits the court imposed on cross-examination of appellant about his Maryland conviction ("[j]ust simply the nature of the conviction and the fact there was a knife involved"). Appellant did not object to that arguable transgression in the trial court, and he has not made it part of his claim of error on appeal. Nor did the trial court indicate a view that the prosecutor had gone beyond what it had meant to allow. In this sensitive area, it would have been appropriate for the prosecutor to have cleared the question about "multiple stabbings" with the court before asking it. That said, we must acknowledge that, for the impeachment to justify the inference that appellant had intended to kill the victim of his prior assault, it was important that the jury appreciate that the assault involved *multiple* stabbings.

offense that were surely probative of appellant's past intent to kill but also more prejudicial to him. Second, the court precluded the government from discussing appellant's prior assault conviction in its closing arguments, recognizing that to allow otherwise would "run[] too great of a risk that the jury would be considering that as propensity evidence."[24]

Third, the court instructed and reinstructed the jury not to misuse the evidence of appellant's prior assault conviction.[25] We recognize that the jury's note in this case revealed uncertainty, on the part of at least one juror, about whether the prior conviction could be used to draw an improper propensity inference. But the court emphatically responded to that note by telling the jurors that the prior conviction was "admitted into evidence solely for [their] consideration in evaluating Mr. Romero's credibility as a witness," and that they "may not consider the prior

---

[24] *See Sanders v. United States*, 809 A.2d 584, 591-92 (D.C. 2002) (upholding admission of video evidence that showed defendant brandishing a firearm at his girlfriend, in an incident unrelated to the charged crime, for the purpose of proving his possession of a firearm, where the court mitigated the prejudicial impact of that evidence with limiting instructions and by "restrain[ing]" the government's reliance on the evidence in closing argument).

[25] *See Pitt*, 220 A.3d at 967-68 ("readily understood" instruction helped to "reduce, if not entirely dissipate, the danger of unfair prejudice" of admission of other crimes evidence (citing *Thompson v. United States*, 546 A.2d 414, 426 (D.C. 1988))).

conviction as establishing a pattern of behavior" and "must not draw . . . an inference" that the conviction was evidence of appellant's guilt. "In the absence of any good reason to suppose otherwise, we presume the jury followed the court's direction."[26]

## III.

We conclude that appellant opened the door to the admission of evidence of facts underlying his prior assault conviction to impeach his testimony that he would never intend to kill somebody. In light of the restrictions the trial court imposed on the prosecution's elicitation and use of those facts, and the court's cautionary instructions to the jury on its consideration of them, we hold the court did not abuse its discretion by allowing the government to cross-examine appellant about his having stabbed the victim of his prior assault multiple times. We affirm appellant's conviction for second-degree murder while armed.

---

[26] *Furr*, 157 A.3d at 1252 (citation omitted).