**Joseph D. WINGATE, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 91–CF–123, 94–CO–241.**

District of Columbia Court of Appeals.

Argued April 11, 1995.

Decided Dec. 29, 1995.

---

**1276**

W. Gary Kohlman, Washington, DC, with whom Richard T. Brown was on the brief, for appellant.

Mary D. Rodriguez, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas C. Black, Abby J. Stavitsky, James F. Rutherford and Carolyn K. Kolben, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and STEADMAN and SCHWELB, Associate Judges.

STEADMAN, Associate Judge:

After a jury trial, appellant was convicted of assault with a dangerous weapon, D.C.Code § 22–502, and related offenses[1] stemming from a fracas involving appellant's estranged wife and her friend, William Morton. Appellant filed a post-trial motion under D.C.Code § 23–110 collaterally attacking his conviction. He asserted that the trial court conducted an inadequate *Monroe–Farrell*[2] inquiry into his pretrial complaints

---

1. The other offenses were possession of a firearm while committing assault with a dangerous weapon (§ 22–3204(b)), second degree burglary with intent to destroy the property of another (§ 22–1801(b)), and destruction of property (§ 22–403). All references to title 22 of the D.C.Code are to the 1989 volume.

2. *Monroe v. United States*, 389 A.2d 811 (D.C.), cert. denied, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978), and *Farrell v. United States*, 391 A.2d 755, 760 (D.C.1978) were our seminal cases on concerns raised pretrial about the competency of defense counsel. The trial court inquiry mandated by those cases is commonly de-

about counsel. He further asserted that his trial counsel was constitutionally ineffective under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He now appeals the denial of that § 23–110 motion. Finding no error, we affirm.

## I.

### A.

The theory presented by the government at trial was that on October 25, 1989, appellant, a corrections officer, had left his post guarding a prisoner at Georgetown University hospital and had gone to his wife's apartment[3] at approximately 3:00 a.m. The complainants, Ms. Wingate and Morton, said that appellant entered his wife's apartment with a pass key[4] and refused to leave when she told him to; while his wife was calling the police, appellant entered the bedroom where Morton was in bed, pointed a gun at Morton, and struck Morton on the back of his head and on his jaw with the gun, then left the bedroom, punched his wife in the jaw, and left the apartment before the police arrived.

In support of its position that appellant had committed the assault at 3:00 a.m., the government presented testimony from appellant's co-worker, Officer Brian Jones, who said that appellant was missing from his post at the hospital for about an hour and a half on October 25; Jones testified that appellant's absence had taken place sometime after Jones returned from his meal break, which he began at 1:00 a.m., and that Jones had submitted a memo to his superiors on October 26 detailing this incident.

Ms. Wingate also testified about a further incident that occurred later the same morning. She said that she left her apartment at 8:30 or 9:00 to file a complaint at the Citizen Complaint Center, and returned to find her bedroom window broken; someone had entered and broken up her furniture, smashed her china and crystal, strewn her clothes around the apartment and poured liquid or cleaning material on them, shattered her mirrors, broken the sink and toilet bowl, damaged her stereo, and taken a fox fur coat and hat and several hundred dollars.

Appellant's defense to the assault charges[5] was that he had assaulted Morton in self-defense, and had not used a gun. He denied striking his wife. Appellant claimed that the incident had happened around 10:00 or 10:30, before he had gone to work at Georgetown Hospital (and therefore before his gun had been issued to him).[6] Appellant said that he had come home and found his wife in bed with Morton, a man who had assaulted him

---

nominated a *Monroe–Farrell* inquiry. *See McKenzie v. United States,* 659 A.2d 838, 839 (D.C.1995).

3. The Wingates were divorced by the time of the trial, but were still married at the time of the incident that led to appellant's conviction. They were married in 1983 and separated in 1986; in January or February 1989, Ms. Wingate moved into appellant's apartment because of financial straits. In August 1989, appellant gave the apartment manager a written notice that he was vacating the apartment due to financial problems; at that time, back rent was due and an eviction notice had been served on appellant. On September 1, 1989, Ms. Wingate signed a new lease in her name only, and requested that the locks be changed. At trial, appellant contended that he was still living in the apartment on October 25, 1989, despite the change in the lease and locks, but Ms. Wingate and other witnesses stated that appellant had moved out in August 1989.

4. Ms. Wingate testified that she had changed the locks and that she possessed the only two sets of keys.

5. He asserted these same facts to the police in a lengthy statement to them several weeks after the incident.

6. Appellant testified that he had gone to his sons' Little League practice that afternoon with a co-worker, James Coverton, and that Coverton had dropped him at the apartment around 10:00 or 10:30 p.m.; he said that Coverton waited outside and drove him to work afterwards, and that Coverton lent him his car the next morning to go back to the apartment and move out his things. However, Coverton testified that he had not been with appellant that day or lent him his car the next morning; he testified that appellant had asked him to say that they had been together, and that appellant had told him that "he hit a guy with a gun." Coverton's testimony was the basis for an obstruction of justice charge; the trial judge granted the defense motion for judgment of acquittal on that charge, on the ground that the government had not proven all of the required elements.

on an earlier occasion[7]; appellant said that Morton came at him in a threatening way and he defended himself by striking Morton with a slapstick. Appellant said that after he left the apartment, he went to work on his 12:00 a.m. to 7:00 a.m. shift guarding a prisoner at Georgetown Hospital, that he was issued a gun when he went on duty, and that he remained at his post the entire time and therefore could not have committed an armed assault on Morton at 3:00 a.m.

Appellant's defense to the burglary charge, see note 1, *supra*, was that he was still living in the apartment with Ms. Wingate, and therefore had a right to be there; he said that he went to the apartment that evening to retrieve forms for filing for reduction in child support that he wanted to work on while he was on duty. Appellant admitted returning to the apartment the next day, ostensibly to move his property out, and when asked by an officer whether he had broken anything in the apartment, he had replied,

> Yes, I sure did.... You come home and find your wife in bed with somebody what are you going to do? Yes, I trashed some things in there. I just broke some glasses, mirror, and some other things ... I turned the table over, the dresser over, anything standing, I turned over. Anything that was standing ... I threw a fire extinguisher into the bathroom and it hit the sink and toilet. It broke them.

Appellant's defense for the destruction of property charges was that he had caused only some of the damage, he had damaged joint property rather than Ms. Wingate's sole property, and Ms. Wingate had had someone else cause further destruction of the property and then had arranged items for the police

photo. Appellant denied stealing the hat and coat and the money.

As rebuttal evidence to appellant's testimony that the assault had been at 10:00 p.m., the government presented testimony from one of the police officers who responded to Ms. Wingate's 911 call. The officer testified that they arrived at the apartment at 3:20 or 3:30 a.m., a few minutes after receiving the 911 call; he testified that Ms. Wingate was hysterical and Morton had a head wound that appeared fresh and was still bleeding.

The jury convicted appellant on four counts, and acquitted appellant on five counts. The trial court granted the defense motion for judgment of acquittal on an obstruction of justice charge at the end of the government's case. *See* note 6, *supra*.

**B.**

In 1992, appellant filed a motion to vacate judgment and grant a new trial under D.C.Code § 23–110[8]; he claimed both that the trial judge erred in failing to conduct a sufficient *Monroe–Farrell* inquiry in response to his pretrial complaints about his counsel, and that that same counsel provided ineffective assistance at trial under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The motion was the subject of a hearing before Judge Stephen G. Milliken on October 25 and 26, 1993. The judge issued a 43–page order denying appellant's motion on February 15, 1994. Judge Milliken concluded that counsel's performance with respect to defendant's alibi was deficient under *Strickland*[9], but found no prejudice. The court's finding of deficiency was based on counsel's failure to contact two potential alibi witnesses (a nurse who worked at Georgetown Hospital and a hospital security guard) until two weeks be-

---

7. *Morton and appellant both testified that in 1986, after appellant and his wife had separated, appellant came to his wife's apartment and found Morton there, and Morton assaulted appellant.*

8. Appellant filed a timely notice of direct appeal in *1991. After he filed the § 23–110 motion in* the trial court, he asked this court to stay his direct appeal pending resolution of the § 23–110. This court ordered such a stay. After Wingate's § 23–110 motion was denied, he noted an appeal

from that denial and moved to consolidate the two appeals. This court granted the motion to consolidate the two appeals and vacated the earlier stay of the direct appeal. Appellant raises no issues other than *Monroe–Farrell* and *Strickland*.

9. Judge Milliken also considered several alleged trial errors by counsel, but concluded that these actions by counsel were either strategic choices or were not in error, a conclusion with which we agree.

fore trial, his failure to contact two other potential alibi witnesses (a corrections officer and a second nurse) until trial [10], his delaying until the second day of trial to subpoena records (a hospital log book and records from the Department of Corrections) which defendant claimed would corroborate his alibi, and his failure to listen to the radio run or view police photographs of the crime scene before trial. However, Judge Milliken found that appellant's *Strickland* claim failed because appellant had not shown that he suffered the requisite prejudice. Appellant had failed to show that but for his counsel's failure to properly present his alibi defense, the result of the trial would have been different; appellant had an opportunity to present each of his defense theories, including his alibi defense, so that any additional evidence supporting his alibi would have been cumulative; the judge did not credit appellant's assertions as to what the witnesses, if contacted earlier, would have testified to at trial, because appellant did not have these witnesses testify at the § 23–110 hearing; and the evidence against appellant was strong.

Judge Milliken also made factual findings relating to what pretrial preparation had in fact been undertaken by counsel, as revealed during the course of the § 23–110 hearing. However, Judge Milliken refrained from making a legal ruling on the *Monroe–Farrell* issue, since he believed that our earlier cases indicated that only the appellate court should resolve the issue of whether a proper *Monroe–Farrell* inquiry had been made. Whatever the situation may be where the § 23–110 judge had also made the *Monroe–Farrell* inquiry and was thus reviewing his or her own decision, we do not fault Judge Milliken's decision not to rule on that legal issue here. We also think Judge Milliken acted quite properly in determining whether counsel was in fact sufficiently prepared for trial in the constitutional sense, the same inquiry that a trial court would make on remand

where no *Monroe–Farrell* inquiry had been made at all. *(Leon) Matthews v. United States*, 629 A.2d 1185, 1193 (D.C.1991). If the judge in a § 23–110 motion hearing determined that trial counsel was in fact constitutionally prepared, the *Monroe–Farrell* issue would effectively disappear from the case, even if the inquiry actually made had been insufficient. *(John) Matthews v. United States*, 459 A.2d 1063, 1066 (D.C.1983).

## II.

### A.

■ Appellant's § 23–110 motion raised both a *Monroe–Farrell* claim and a *Strickland* claim. When a *Monroe–Farrell* claim is joined with a *Strickland* claim on collateral attack, this court first ensures that the *Monroe–Farrell* claim has been definitively resolved before dealing with the *Strickland* inquiry. *McFadden v. United States*, 614 A.2d 11 (D.C.1992). Hence, we turn first to that issue.

In *Monroe*, we first ruled that in this jurisdiction, "[w]hen a defendant makes a pretrial challenge to the effectiveness of counsel ... on the ground that counsel, due to lack of investigation, preparation, or other substantial reason, is not rendering reasonably effective assistance, the trial court has a constitutional duty to conduct an inquiry sufficient to determine the truth and scope of the defendant's allegations." *Monroe, supra*, 389 A.2d at 820. We have reaffirmed this requirement of a pretrial inquiry in a series of subsequent opinions. *See, e.g., Garrett v. United States*, 642 A.2d 1312 (D.C.1994); *(Leon) Matthews v. United States*, 629 A.2d 1185 (D.C.1993); *McFadden v. United States*, 614 A.2d 11 (D.C.1992); *Nelson v. United States*, 601 A.2d 582 (D.C.1991); *Johnson v. United States*, 585 A.2d 766 (D.C. 1991); *Gordon v. United States*, 582 A.2d 944 (D.C.1990); *Bass v. United States*, 580 A.2d

10. Appellant had told his counsel that the two nurses and the security guard could verify that he had not left the hospital, and that his supervisor, a corrections officer, could verify that he had called in to report the status of the prisoner and therefore could not have left the hospital. At trial, one nurse and the security guard were witnesses, but both testified that they were not sure whether they had seen appellant on the night of the incident. The corrections officer testified at trial that he had no specific memory of the night of the incident. Counsel did not contact the second nurse to testify at trial, because he was told that she was recovering from childbirth and that she knew nothing that could help the defense.

669 (D.C.1990); *Robinson v. United States,* 565 A.2d 964 (D.C.1989); *Fields v. United States,* 466 A.2d 822 (D.C.), *cert. denied,* 464 U.S. 998, 104 S.Ct. 497, 78 L.Ed.2d 690 (1983); *(John) Matthews v. United States,* 459 A.2d 1063 (D.C.1983); *Butler v. United States,* 414 A.2d 844 (D.C.1980); *Pierce v. United States,* 402 A.2d 1237 (D.C.1979); *Farrell v. United States,* 391 A.2d 755 (D.C. 1978). However, in *Monroe,* "we refrained from establishing the precise form which the requisite inquiry must take. Rather, because the nature of the inquiry turns on the specific circumstances presented in each individual case, we committed the substance and scope of the inquiry to the sound discretion of the trial court." *Farrell, supra,* 391 A.2d at 760. As we have previously noted in the *Monroe–Farrell* context, "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *McKenzie, supra,* 659 A.2d at 840 (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985)). The trial judge is in the best position to determine the credibility of counsel's assertions that he is prepared and a defendant's assertions that his counsel is ineffective; it is proper that we defer to the trial judge's determination as to the "form, substance and scope of the inquiry" unless the record compels us to act other-

wise. *See Garrett, supra,* 642 A.2d at 1314 n. 1 (D.C.1994) ("The precise form, substance and scope of the inquiry is committed to the sound discretion of the trial court," citing *Farrell* ).[11]

The case before us is unusual in that a rather lengthy *Monroe–Farrell* inquiry was in fact made, and therefore appellant is challenging the sufficiency of that inquiry, rather than alleging that the court did not inquire at all into his pretrial allegations of ineffectiveness, as was the case not only in *Monroe* itself but also in the great majority of cases addressing the *Monroe–Farrell* issue. This case is most similar in posture to *Farrell* itself, in which the trial court asked counsel a number of questions about his preparedness.[12] In *Farrell,* we held, "[t]he inquiry here never addressed, and thus never contradicted or substantiated, the specifics of appellant's complaint." A "mere routine inquiry—the asking of several standard questions" did not constitute a sufficient inquiry into pretrial claims of ineffectiveness. *Id.* at 761–62. The court had asked questions, but the questions did not address the concerns that the defendant had articulated.

Appellant cites *Pierce v. United States,* 402 A.2d 1237 (D.C.1979), as another case where the court had made inquiry and we found the inquiry to be insufficient. *Pierce* is some-

**11.** Many other jurisdictions also use the abuse of discretion standard to review the adequacy of a trial court's inquiry into pre-trial complaints about counsel. *See, e.g., Augsberger v. State,* 655 So.2d 1202, 1204 (Fla.Dist.Ct.App.1995); *State v. Kazee,* 146 Wis.2d 366, 432 N.W.2d 93, 96 (1988); *State v. Pursifell,* 746 P.2d 270, 273 (Utah App.1987); *Commonwealth v. Chavis,* 415 Mass. 703, 616 N.E.2d 423, 428 (1993); *U.S. v. Fagan,* 996 F.2d 1009, 1014–15 (9th Cir.1993); *United States v. Allen,* 789 F.2d 90, 92–93 (1st Cir.), *cert. denied,* 479 U.S. 846, 107 S.Ct. 164, 93 L.Ed.2d 103 (1986); *United States v. Laetividal–Gonzalez,* 939 F.2d 1455, 1466 (11th Cir.1991), *cert. denied,* 503 U.S. 912, 112 S.Ct. 1280, 117 L.Ed.2d 505 (1922). A higher standard applies when the trial court made no *Monroe–Farrell* inquiry whatsoever; in such cases we cannot defer to the trial court's discretion, since the court has failed to exercise any discretion. Instead, the government has to show by clear and convincing evidence that the defendant was represented at trial by an attorney who was prepared within the normal range of reasonable competence. *(John) Matthews, supra,* 459 A.2d

at 1066. However, we emphasized in *Matthews* that "[w]e adopt the clear and convincing standard of proof only for the particular situation here: where it is demonstrated after trial that the trial court failed to hold any hearing at all prior to trial ..." *Id.*

**12.** In *Farrell* the trial court had twice denied the defendant's request for a new attorney *before* making any inquiry about the defendant's complaints. "It was only after the trial court had denied each of appellant's motions that it engaged in any inquiry into appellant's claim. However, the nature of the inquiry belatedly conducted does not mitigate the error." 391 A.2d at 761. Thus, "[t]he trial court's denial of appellant's motion to change counsel without any inquiry, and the deficient nature of the inquiry which it did subsequently conduct into the level of counsel's preparedness, failed to manifest the requisite solicitude for an accused's essential right to have the effective assistance of counsel guaranteed by the Sixth Amendment." 391 A.2d at 762.

what dissimilar from the case before us, since in *Pierce* it was not the defendant but counsel who raised the issue by telling the court that he had doubt of his competence to try the case without the assistance of more experienced co-counsel. The trial judge had a considerable colloquy with counsel (resulting in counsel later concluding that he could try the case alone) but never asked the defendant any questions, and indeed the defendant was not even present for most of the colloquy. We held the inquiry inadequate both on this basis and on the fact that the trial court had failed to inquire into the issue actually raised; viz., whether counsel's background and experience were in fact sufficient to competently try the case. "[T]he nature and scope of [the required inquiry by the court] turns on the basis for the request for co-counsel." 482 A.2d at 1244.

On subsequent occasions, we have had occasion to reassert this principle that the substance of the complaints about counsel's performance governs the nature of the mandated inquiry. *See Nelson, supra,* 601 A.2d at 592 (court "had an obligation to question defense counsel directly, on the record, about the specifics of [defendant's] complaint before making its ruling."); *McFadden, supra,* 614 A.2d at 16 (court erred in not "elucidat[ing] from counsel information to rebut, or substantiate, the specifics of appellant's complaint.") (citing *Monroe* ); *Gordon, supra,* 582 A.2d at 945 (trial court must conduct detailed inquiry "to elicit the nature of the defendant's complaint, and whether it is based in fact"). Recently, in *McKenzie v. United States,* 659 A.2d 838 (D.C.1995), we applied this principle in a related context. McKenzie had sent a pretrial letter to the trial court complaining about his counsel, thereby triggering a *Monroe–Farrell* inquiry. At the hearing, however, the defendant indicated that he was now satisfied with his counsel. We held that the trial court properly terminated the inquiry at that point. "We are satisfied that the trial court here did all that was required in the circumstances." 659 A.2d at 840. *See also Robinson v. United States,* 565 A.2d 964, 969 (D.C.1989) (court did not err in failing to conduct *Monroe–Farrell* inquiry, where appellant had made many requests for new

attorney but when court asked appellant to state the basis for desire for a new attorney, "appellant himself concluded that he was ready and willing to go forward with his present attorney"); *Gordon v. United States,* 582 A.2d 944, 947 (D.C.1990) (judge did not err in failing to ask questions of defense counsel when, after judge addressed appellant's problems and questions, appellant said she wanted to go to trial and would keep her defense attorney; "appellant's complaints provided no basis for the judge to inquire further into the attorney-client relationship or about defense counsel's preparation for trial").

We turn, then, to an examination of the pretrial inquiry held in this case in light of the foregoing principles.

### B.

■ On Thursday, December 6, 1990, the parties having announced that morning that they were ready for trial, the case was certified to Judge Henry F. Greene. At the outset of proceedings that afternoon, responding to an inquiry as to any outstanding pretrial matters, appellant's counsel informed Judge Greene that appellant had complaints about his representation; when Judge Greene asked counsel to explain the conflict between him and his client and asked whether it was just a strategy, counsel said, "I guess it's a strategic, basic question whether or not it's in the client's best interest to plead guilty." Judge Greene then asked appellant to come to the bench with counsel, and conducted an extensive *Monroe–Farrell* hearing.

Judge Greene first asked why this problem had never been brought to the court's attention until the very day of trial. Counsel replied that between the time that he had announced ready for trial and that afternoon, a conflict had developed. Over lunch, appellant had expressed concern about the direction of the trial, had said that counsel was too pessimistic about his prospects, and had said that more time was needed to gather documents for the trial. Judge Greene pointed out that counsel had announced ready that morning, and asked counsel

whether he was satisfied that he was ready; counsel replied:

> I believed I was ready. There were certainly some things that I would have preferred to have, but I believe that it was nothing necessarily uncommon or untoward in terms of ordinary representation.

Judge Greene then asked appellant why he didn't believe he was ready for trial. Appellant stated that his counsel "has always wanted me to cop a plea" but appellant "from day 1 ... decided to fight," that he had said, "[Counsel], fight on my behalf," and had told counsel "I was not ready ... because we did not come to an agreement on my defense strategy and I was still waiting on some pertinent information along with the case ... I was still waiting on some pertinent information on my defense to come in." [13] Counsel responded that appellant "had expressed concern that not every single piece of documentation that he would like to have had was not in his possession," but that although appellant asked him to move for a continuance on Tuesday, he could not do so because the two-day rule was in effect, and also there had been two previous defense continuances and he believed the court would not look favorably upon a request for another.

Judge Greene then asked appellant, "What is the reason you think you're not ready now?" Appellant stated that he didn't have a police report from Prince George's County; the judge asked him a number of questions about when he applied for the report, how long he had known he needed the report, and what specific efforts he had made to obtain it. Appellant then added, "The other thing is all the leg work done, getting information, getting ...", but the judge asked him to wait on that issue until they had dealt with the question of the police report. The judge then asked counsel what he knew about the report and whether he had subpoenaed it; counsel explained that they had not been able to subpoena the report, which concerned a 1986 assault on appellant, because the report did not contain the name of the person who assaulted him,[14] and therefore no charges had been brought against the assailant and "no report was ever properly docketed." The judge stated, and counsel agreed, that "[w]e don't even know if this form exists then".

The judge then asked appellant, "What other reasons are you not ready?" Appellant returned to the issue he'd raised a moment before, saying "That's the other thing I was going to say, your Honor, is that all the information that needs to be gathered, [counsel] had me gather it—witnesses, character witnesses, information ... but he's never took the time to look over ..." The judge said he would discuss that with counsel in a minute, and asked what other reasons appellant had to think he wasn't ready for trial. Appellant said that his counsel "seems as though he's been working with the Government to plea bargain." The judge replied that it was purely speculation to say that defense counsel was working for the government, and the court file gave no basis for that assertion. The judge then said, "Okay, [counsel], I want to make some inquiries of you", but first gave appellant a chance to make any further complaints, asking, "Any other reasons you're not ready in this case, Mr. Wingate?" Appellant replied, "Like I said, those are the two distinct—", and reiterated his complaint that he hadn't received the police report and that counsel hadn't subpoenaed the report.

Judge Greene then made a lengthy inquiry into counsel's preparation. The judge asked for details on several issues, including how often counsel had conferred with his client

---

13. This was defendant's only mention of any possible disagreement on strategy. Coming as it did shortly after the colloquy about the dispute over the "strategy" of plea bargaining, we think the trial court could reasonably conclude that defendant was referring to that disagreement, especially since any disagreement over strategy was never raised again.

14. Appellant had made a complaint to police after Morton had assaulted him in 1986, see n. 7,

*supra.* However, appellant had not known Morton's name when he filed the complaint, as Ms. Wingate had refused to provide any information to appellant or to police. When counsel finally did obtain the report, during trial, it merely said that appellant had been assaulted by an unknown suspect and had been treated at the hospital. As already noted, see n. 7, *supra,* Morton admitted at trial that he had assaulted appellant in 1986.

and whether they had met in person or spoken on the phone; whether counsel had investigated the facts, spoken to witnesses, and subpoenaed witnesses; whether he had investigated the legal issues; whether any tangible evidence had been seized; whether there was any issue of competency; whether he had fully explored plea prospects; and whether counsel was prepared for trial, including whether he was ready for *voir dire* and his opening statement.

Judge Greene then asked, "Mr. Wingate, what do you want to say in response to any of the things your counsel said?" The following colloquy resulted:

> THE DEFENDANT: My major concern is the lack of concern for my wellbeing and the lack of concern for my counsel on innocent until proven guilty. That is my major concern, along with the initiative to take time out to overlook the paperwork to substantiate what I'm telling him beforehand. Today was the first time he looked at it all in person briefly.
>
> \*     \*     \*     \*     \*     \*
>
> THE COURT: I want to know if there's critical evidence in this case that's been available to you for some period of time and you've only looked at for the first time today.
>
> [COUNSEL]: It's true there is evidence that I have seen today for the first time. Now, the question—
>
> THE COURT: That wasn't available to you earlier?
>
> [COUNSEL]: That's my point. There are things that I have been specifically requesting that Mr. Wingate provide that I have not seen. Yes, I did see some of those new documents today. Some of them—some of them are important, some of them don't go as far as I believe my client believes they go . . .

The judge then asked counsel whether he could represent his client with the vigor and zeal required by the Code of Professional Responsibility, and counsel said that he

could. At the end of the inquiry, the judge said to appellant that he had to understand that his counsel was both an advisor and an advocate, and that often a defense attorney's best advice might be that his client should plead guilty, but that if his client decided not to plead guilty, the attorney's job would be to act as a zealous advocate; the judge said that based on the inquiries he had just made, he had no reason to believe that appellant's counsel wouldn't be capable of advocating with zeal and force and persuasion. Appellant then said that he was seriously concerned because when he mentioned the investigator's name to counsel that day, counsel didn't know who he was talking about, and therefore that was his only concern, the vigor and the zeal. Counsel replied that he hadn't initially recognized his investigator's name because he had just gone through a lot of documentation with a lot of names and places and times, and the investigator's name had momentarily slipped his mind because of "just simply being on overload, in terms of trying to remember as many facts as I had to today . . ." both in the documentation and in a separate appellate argument he had had that morning.

The judge then ended the *Monroe–Farrell* inquiry, and stated his findings for the record, saying,

> I have had a fuller discussion than probably the prosecutors would have liked, just from the standpoint of how long they have been kept waiting, with [counsel] and Mr. Wingate about [counsel's] representation, and Mr. Wingate and I have gone through as complete a *Monroe–Farrell* inquiry as I could go through in this case. I am satisfied that Mr. [Wingate] is competently and adequately and ably represented, and [counsel] that he is prepared for trial, and that there is no basis to either permit him to withdraw, to require him to withdraw, or to have further counsel in this case. I am also satisfied that there is no basis to grant a continuance in this case.[15]

---

15. The judge continued dealing with pretrial matters, including a brief hearing on one of the issues that had been raised during the *Monroe–Farrell* inquiry, namely, whether appellant's statement to the police should be suppressed.

Counsel had not filed a motion to suppress earlier, but said during the inquiry that something appellant had said to him a couple of days before had led him to believe (contrary to his earlier analysis) that he might have grounds to move to

### C.

We can find no abuse of discretion in the "form, substance and scope" of this inquiry. The trial court's inquiry was tailored to carefully explore the specifics of appellant's complaints, unlike the situation in *Farrell* and *Pierce*. Here, the trial court followed up on each of appellant's assertions. Further, the court gave appellant several opportunities to state all of his complaints,[16] at the beginning, the middle, and the end of the inquiry. Appellant stated at the outset that he wasn't ready, that counsel wanted him to take a plea and that he was waiting for some information that he needed at trial. The court then asked appellant why he felt he wasn't ready, and appellant raised the issue of the police report; the court pursued the issue with both appellant and counsel, until counsel explained that the report concerned an assault on appellant by someone whose name appellant had not known, and the report might not even be in existence. The court then asked appellant what other reasons he had, and appellant said (returning to an issue he had just raised during the discussion of the police report) that counsel had not looked at all the information he had gathered; the court said he would discuss that with counsel in a minute (which he did). The court asked a third time what reasons appellant had, and appellant alleged that it seemed like his counsel was working with the government to plea bargain. The court replied that that was speculative, and asked if appellant had any other reasons; appellant returned to the issue of the police report. The court then made a detailed inquiry as to the amount of counsel's preparation, including how often

counsel had consulted with his client and whether counsel had investigated the facts and spoken to witnesses. After these questions, the court returned to appellant and asked him for a response; appellant replied that his counsel wasn't sufficiently concerned for his innocence (presumably a reference to counsel's advice that he should plead guilty), and said that counsel hadn't looked at some of the evidence until that day. The court turned to that issue and asked counsel whether there was evidence that had been available earlier that he had only seen that day; counsel replied that there were documents that he had seen for the first time that day, some of them important and some not, but indicated that the documents were not available to him earlier because he had asked appellant to provide them and appellant had brought them that day. Finally, appellant expressed concern that counsel would not act with vigor and zeal for him, because counsel had forgotten the name of his own investigator when speaking to appellant; counsel explained that he had been overloaded with facts and documents and had not immediately recognized the name. The court asked counsel several times whether he would represent appellant with vigor and zeal, and counsel replied that he would do so. The trial court thus was acutely aware of its obligation to explore those elements of alleged ineffective representation that were giving appellant pretrial concern and conscientiously did so. This approach of extensive involvement of appellant was particularly appropriate here; the judge specifically commented that appellant had "talked to me as articulately and intelligently as any man ever has." *See also McKenzie, supra,* 659 A.2d at

suppress, based on a promise of favorable treatment as a professional courtesy. The court conducted a hearing in which both appellant and the officer who had taken the statement testified. The officer testified that no special treatment had been promised to appellant; appellant testified that he had been promised that as soon as he made a statement, the process would be as expedient as possible and he would be released around 7:00 p.m. Appellant testified that he would not have given a statement if that promise had not been made. At the end of the hearing, the judge stated that he believed the officer and not appellant, particularly since appellant had

never called these alleged promises to the court's attention until the eleventh hour.

16. The judge asked appellant at the outset of the inquiry what reasons he had to think that he was not ready for trial, and asked three more times what other reasons appellant had for believing that he was not ready. After appellant had articulated all of his reasons, the judge made many inquiries as to counsel's preparation, and then the judge returned to appellant, asking him if he had a response to what counsel had said. The judge then followed up on the concerns appellant articulated at that point, and then concluded the inquiry.

840 ("McKenzie both by his letter and his *pro se* motion had shown that he was not hesitant to register dissatisfaction with counsel and knew how to do so"). In sum, "we are satisfied that the trial judge did all that was required in the circumstances." *Id.*

**D.**

▮ It is, of course, true that the pretrial inquiry did not elicit some of counsel's deficiencies in preparation that were disclosed at the post-trial § 23–110 hearing. But we must evaluate the court's *Monroe–Farrell* inquiry on the basis of the situation presented to the court pretrial, rather than by hindsight examination, a procedure that cuts two ways. *See McFadden, supra,* 614 A.2d at 14 ("this court has scrupulously preserved *Monroe–Farrell* rights against erosion by hindsight examination of at-trial performance of counsel."); *Bass, supra,* 580 A.2d at 672 n. 6; *Monroe, supra,* 389 A.2d at 821 (D.C.1978) ("Our review of such an inquiry will focus—as must the trial court's—on the situation existing at the time of the inquiry."); *(Leon) Matthews, supra,* 629 A.2d at 1193 (on remand, trial court determines "whether or not, viewed pretrial, appellant was denied the effective assistance of counsel.") [17]

At the § 23–110 hearing, and on appeal, appellant's complaints about trial counsel's pre-trial preparation were more specific [18],

and concerned other areas [19], than the complaints which appellant raised during the *Monroe–Farrell* hearing, *see* Order at 16 ("At the § 23–110 hearing, defendant clarified his testimony from the *Monroe–Farrell* inquiry.") However, since appellant did not raise these issues during the *Monroe–Farrell* hearing, Judge Greene had no notice that these were areas he should ask about. Moreover, Judge Greene cannot be faulted for this lack of notice: the judge gave appellant, whom the judge viewed as an articulate and intelligent man [20], numerous opportunities to express his reasons for dissatisfaction with counsel, and the judge inquired into all the areas that appellant raised at that time.[21]

Appellant now points to several of counsel's statements to show that the trial court knew of deficiencies in counsel's preparation, even in areas that appellant had not complained about. Appellant asserts that the court learned that counsel had failed to subpoena a witness, hadn't prepared an opening statement, and hadn't made a motion to suppress. However, counsel in fact explained to the trial court his reasons for acting as he had: he planned to subpoena the witness that afternoon, since he expected the government's case to last for a couple of days; he planned to give his opening statement at the conclusion of the government's case, and therefore did not have it written out pretrial; and he had not believed that they

17. *See also State v. Hamilton,* 636 A.2d 760, 762–4 (Conn.1994), holding that a trial court did not abuse his discretion in refusing to grant a continuance for the purpose of possibly retaining new counsel; the court held that

an appellate court should limit its assessment of the reasonableness of the trial court's exercise of its discretion to a consideration of those factors, on the record, that were presented to the trial court, or of which that court was aware, at the time of its ruling on the motion...

18. At the § 23–110 hearing, appellant described documents other than the police report that counsel failed to subpoena, i.e., a sign-in log from Georgetown Hospital and records from the Dept. of Corrections. However, appellant conceded that during the *Monroe–Farrell* hearing, he had said that the police report was the only piece of information he thought was lacking.

19. At the § 23–110 hearing, appellant testified that he had initiated all conversations with counsel, and that counsel had left him completely in the dark about the defense theory they would

present at trial. However, Judge Milliken did not credit appellant's assertions. Appellant also testified that counsel never prepared him to testify and that he was forced to testify without preparation because no other witnesses were available, but Judge Milliken did not credit that assertion either.

20. Appellant had attended Montgomery College and Langston University and was a Marine Corps veteran.

21. Near the end of the inquiry, after appellant had aired several complaints, he raised his concern with the fact that counsel had not immediately recognized the investigator's name when appellant mentioned it, and that appellant was therefore worried about counsel's zealousness as his advocate. At that time, appellant said, "[t]hat is my only concern—the vigor and the zeal. That is my only concern, is the vigor, the zeal and the concentration. That is my only concern." This statement starkly conveyed the message that appellant had no further concerns which he had not aired as yet.

should file a motion to suppress, but appellant had said something to him within the last couple of days that made him think that he should file such a motion, and therefore he did file an oral motion to suppress during the hearing. See note 15, *supra.* At oral argument before us, two additional instances were raised: counsel's failure to get the best possible plea offer and to listen to the radio run before trial. However, appellant himself said he was opposed to any plea bargain, the radio run issue did not arise until after the *Monroe–Farrell* inquiry, and in any event, counsel did not say he wouldn't listen to the run before trial.

Judge Milliken made his finding that counsel's pretrial investigation into appellant's alibi defense was constitutionally inadequate after a full-fledged trial-type hearing which lasted for two days, complete with witnesses and cross-examination; he was able to consider counsel's pretrial performance in light of his trial performance, and because of the nature of the § 23–110 hearing, he was able to reflect for several months before issuing a decision. But hindsight is a powerfully deceptive weapon. It is not difficult to identify how such and such an additional question would have uncovered such and such a fact, especially when the facts into which to inquire are now known. But what we must decide is whether Judge Greene abused his discretion in his conduct of the hearing on counsel's readiness for trial, based on the complaints and the facts articulated before him at that time. We conclude that he did not.[22]

22. *Cf. Pursifell, supra* note 11, 746 P.2d at 272–74 (Utah App.1987) (where court mainly inquired into issue that was focus of defendant's complaint, no reversible error, even though defendant suggests on appeal that "had the trial court conducted a more extensive inquiry into the reasons for defendant's dissatisfaction, it would have uncovered a myriad of complaints about the quality of defendant's representation.")

23. To prevail on a claim of ineffective assistance of counsel, a defendant must show both that his counsel's performance was constitutionally deficient, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. *See Kinard v. United States,* 635 A.2d 1297, 1303 (D.C.1993). Since we agree here with the trial court that there was no such prejudice, we do not reach the question of whether

## III.

■ Turning to appellant's *Strickland* claim, we affirm Judge Milliken's ruling that the claim founders on the prejudice prong.[23] Regarding the finding that counsel was ineffective in his delay in interviewing two potential witnesses and in not interviewing two others at all, Judge Milliken noted that a defendant asserting prejudice under *Strickland* has the burden of establishing what a witness' testimony might have been, and should submit proof, by affidavit or by testimony, that a witness would have helped to exculpate him. *See Hollis v. United States,* 623 A.2d 1229, 1234 (D.C.1993). As Judge Milliken found, appellant did not furnish proof that the nurse and security guard who testified at trial would have testified differently if they had been contacted earlier; he did not even provide affidavits from the witnesses stating that they no longer remembered whether appellant had been at the hospital on the night in question, but suggesting that if they had been promptly interviewed they might have been able to remember better.[24] All that appellant presented at the § 23–110 hearing was his own self-serving assertion that he had spoken to the witnesses soon after the incident and that they had remembered that he had been present; this mere assertion is insufficient to satisfy the prejudice prong.[25] *See Sykes v. United States,* 585 A.2d 1335, 1338–39 (D.C.1991); *cf. Rice v. United States,* 580 A.2d 119 (D.C. 1990) (reversing summary denial of § 23–110

counsel was in fact ineffective. *Id.* (since failure to make either showing of prejudice or deficiency will defeat the § 23–110 motion, court may resolve the motion by examining only the prejudice prong).

24. Although Judge Milliken did not specifically make a finding of why there was no prejudice with regard to the other two witnesses (the corrections officer and the second nurse, *see* note 10, *supra*), the same reasons would seem to apply to these witnesses as to the security guard and the first nurse.

25. Furthermore, Judge Milliken specifically found that since appellant did not have the nurses or the security guard testify at the § 23–110 hearing, he did not credit appellant's assertions that he had spoken to these witnesses soon after the incident and that they had remembered his being at the hospital on October 25, 1989.

motion where defendant provided signed statements from alibi witnesses saying that they would have testified in his behalf if counsel had contacted them). A court cannot engage in sheer speculation about what an investigation by counsel might have revealed or what witnesses he might have called. *See Williams v. United States*, 421 A.2d 19, 25 (D.C.1980).

Judge Milliken also found that even if counsel had produced the hospital's sign-in and sign-out security log at trial, the log would not have established appellant's alibi, since it was admitted that the security procedures were not foolproof.[26] First, appellant testified at trial that he didn't sign in when he first arrived at the hospital because "[t]here's no actual log for us to log-in when we get there." Appellant argued that the log would have proven that he did not sign in a second time and therefore that he did not leave the hospital and return, but since he testified that he did not even sign in the first time, the fact that he did not sign in a second time would have been inconclusive. Second, if the log had been produced, the most it could have shown was that appellant had not signed in after the time that the government said the assault was committed; this negative evidence would have been weighed against Officer Jones' testimony that appellant was missing from his post at that time, the police officer's testimony that Morton's wound was fresh at 3:30 a.m., and Coverton's testimony that appellant had asked him to lie in order to make it appear that the assault had been at 10:00 p.m., so that appellant would not get in trouble for "hit[ting] a guy with a gun."[27] We agree with Judge Millik-

en's finding that "the questionable existence of the log book and its possible impact is far too tenuous to meet the burden set forth in *Strickland*."

The trial court also took note that the evidence against appellant was strong, that he had the opportunity to present each of his defense theories, including alibi, and that any additional evidence supporting his alibi would have been cumulative. Indeed, one of the counts of which appellant was convicted, destruction of the landlord's property, had been admitted by appellant in his statement and on the stand (although he tried to retreat from his earlier statement by claiming that he had only done some of the damage; the conviction for burglary (entering the apartment with intent to destroy another's property) followed almost inevitably from his admission that he had entered the apartment and "trashed some things" because "[y]ou come home and find your wife in bed with somebody what are you going to do?", and from his admission that he had broken the bathroom fixtures belonging to the landlord.[28] He also admitted assaulting Morton. His argument that he had assaulted Morton at 10:00 p.m. with a slapstick rather than at 3:00 a.m. with a gun was greatly weakened, as we have noted, by the testimony of two disinterested witnesses, Coverton and Jones, one of which said that appellant tried to falsify corroboration for the time he claims the crime occurred, and the other said that appellant was missing from his post at the time that appellant claims to have an alibi. In sum, we agree with the trial court's ultimate conclusion that "while counsel was deficient for failing to investigate the leads supplied by

---

**26.** Similarly, while Judge Milliken found that counsel was deficient in delaying until the second day of trial to subpoena business records from the Department of Corrections relating to appellant's duty assignment, the judge concluded that they did not support the alibi defense and would not have affected the outcome of the trial.

**27.** We see no basis for concluding that counsel's failure to listen to the radio run until trial resulted in cognizable prejudice to appellant. Despite appellant's creative depiction in his brief of a closing argument that could have been based on the radio run, an argument based on such depiction is completely speculative and there was no "reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Strickland, supra*, 466 U.S. at 694, 104 S.Ct. at 2068. Furthermore, appellant claims that if counsel had listened to the radio run earlier, he could have argued that the 911 call showed that Ms. Wingate at first denied knowing the man who entered her apartment. His counsel, however, made that very point when cross-examining Ms. Wingate.

**28.** Furthermore, appellant does not suggest that the proposed alibi witnesses could have given any testimony that would have exonerated him from the burglary or destruction of property charges.

the defendant, and indeed ignoring these leads until days before trial, the defendant failed to show that there is a reasonable probability that the evidence, assuming that it existed and was produced, would have affected the outcome of the trial."

*Affirmed.*

WAGNER, Chief Judge, dissenting:

Unlike my colleagues, I cannot say that the trial court's pretrial inquiry was sufficient to meet the strictures of *Monroe–Farrell.* A more searching inquiry would have revealed the inadequacies in trial counsel's performance as subsequently disclosed in the hearing under D.C.Code § 23–110, which the trial court found to be constitutionally deficient under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Even on the basis of the pretrial record developed, it appears that counsel was "unprepared to give effective representation at trial, [and] appellant was constitutionally entitled to the appointment of new counsel." *Farrell v. United States,* 391 A.2d 755, 762 (D.C.1978).

During the *Monroe–Farrell* hearing, appellant made the following complaints to the trial court about his counsel's representation: (1) that counsel had pressured him to plead guilty;[1] (2) that counsel was not acting as his advocate and had failed to agree on a defense;[2] (3) that he was not ready for trial because he had not received information he thought pertinent to his case;[3] (4) that counsel had left securing the witnesses and evidence to him;[4] (5) that trial counsel had not reviewed the information appellant gathered; (6) that counsel was not concerned about his well-being, the presumption of innocence, and investigating his defense;[5] (7) and that counsel lacked vigor, zeal and concentration.[6]

1. The following are examples of appellant's efforts to inform the court about his own decision to defend the case and his counsel's attempt to persuade him to enter a plea of guilty while failing to discuss with appellant defense strategy:

   [F]rom day 1 [my attorney] has represented me, from day 1 I was arrested, he has always wanted me to cop a plea.

   \* \* \* \* \* \*

   When I lost my job, [my attorney] conveyed to me to again accept the plea offer.... He strongly urged me to accept it.... *From day 1 I decided to fight....*" (emphasis added).

   \* \* \* \* \* \*

   [My attorney]—seems as though he's been working with the Government to plea bargain. *He's not talking about any defense,* he's always talked to me about settling, plea bargain. (emphasis added).

2. In this regard, appellant stated:

   [T]oday when I produced this [complaint form], I said, ... fight on my behalf. When we were before Judge King, I tried to tell him I was not ready. *Tuesday I told him I was not ready, I said because we did not come to an agreement on my defense strategy* and I was still waiting on some pertinent information along with the case. (emphasis added). During the lunch break I produced this and said, 'Talk on my behalf or I will fill this out and send it to bar counsel.

   \* \* \* \* \* \*

   When we were before Judge King, I told [him]—I was trying to get his attention and said, "Look, I'm not ready." He told me to be quiet and he told Judge King that he was ready. Tuesday night when we talked, I told him I was not ready and I was still waiting on some pertinent information on my defense to come in.

3. In response to the court's question as to why appellant thought he was not ready for trial, appellant stated, "All right. One key piece of information was a police report that I need to obtain from P.G. County." Appellant referred to the report again when the trial court asked if there were other reasons he felt unprepared for trial: "Like I said, those are the two distinct reason—because I haven't received the papers, and he hasn't tried to subpoena them or anything."

4. Appellant told the trial court that:

   That's the other thing I was going to say, Your Honor, its that all the information that needs to be gathered, [my attorney] had me gather it—witnesses, character witnesses, information.

5. Appellant stated:

   My major concern is the lack of concern for my wellbeing and the lack of concern for my counsel on innocent until proven guilty. That is my major concern, along with the initiative to take time out to overlook the paperwork to substantiate what I'm telling him beforehand. Today was the first time he looked at it at all in person briefly.

6. After the trial court explained that when a client decides not to plead guilty, an attorney's "job is to advocate before the Court and the jury with zeal and force and persuasion," appellant responded:

I cannot agree with the majority that the trial court could conclude reasonably that appellant was complaining about the disagreement over plea bargaining alone. Rather, appellant expressed dissatisfaction that counsel's only strategy was to enter a plea, instead of preparing a defense.[7] Moreover, defense counsel expressed his own uncertainty about being prepared to proceed to trial when it took a series of questions from the court before defense counsel would state unequivocally that he was prepared to represent appellant at trial within the required standards of professional responsibility.[8]

Although the *Monroe–Farrell* inquiry was lengthy, the trial court failed to "ascertain the concrete steps taken by counsel in preparation of the case and to evaluate their sufficiency under the circumstances." *See Monroe v. United States*, 389 A.2d 811, 819 (D.C. 1978). Specifically, the trial court did not focus on appellant's claim that his counsel had not investigated the case or prepared a defense. Instead, the court directed its attention to counsel's reasons for not seeking a continuance and appellant's claim of lack of preparation for trial based on his failure to receive a police report from Prince George's County. The court's remaining inquiry, concerning discovery, witnesses, physical evidence, investigation of the crime scene, and counsel's failure to file pre-trial motions, consisted of standard questions to which the court did not insist upon specific answers. Such a routine inquiry " '[left the] judge entirely unaware of the facts essential to an informed decision [as to defense counsel's preparedness for trial].' " *Farrell v. United States*, 391 A.2d 755, 761–62 (D.C.1978) (quoting *von Moltke v. Gillies*, 332 U.S. 708, 724, 68 S.Ct. 316, 323, 92 L.Ed. 309 (1948)). The court's inquiry failed "to determine at the time of the defendant's complaint 'the truth and scope' of his allegations." *Matthews v. United States*, 459 A.2d 1063, 1065 (D.C.1983).

While the scope of the inquiry depends upon the circumstances in each case, this court has identified criteria for determining whether counsel's preparation falls within the range of competence required by defense counsel in a criminal case, none of which were fully met here. The criteria include:

(1) whether counsel conferred with the defendant as often as necessary and advised him of his rights, (2) whether counsel elicited from the defendant matters of defense and then ascertained if any potential defenses were unavailable, and (3) whether counsel conducted both a factual and legal investigation sufficiently in advance to permit reflection and to determine if matters of defense could be developed.

A: In other words, I was here if I was given some amount of time to be there?
Q: Yes.
A: I don't see any reason why I couldn't.
Q: Well, would you? Would you represent him with the zeal and the vigor that is required of counsel under the Code of Professional Responsibility?
A: I could and it's my—been my intention to provide such representation.
Q: And you would do so? Is that what you're telling me?
A: I hope I would do so, yes.
Q: Well, sir, do you have some reason to think you wouldn't?
A: No, there is no reason to think that I wouldn't, Your Honor.

---

Like I say, that is the only thing I request, and I have serious concern with that because when we were talking at lunchtime I mentioned to [my attorney] that one of his investigators, Mr. Glydd (phonetic), he was like—he didn't even know who I was talking about. That is my only concern—the vigor and the zeal. That is my only concern, is the vigor, the zeal and the concentration. That is my only concern.

7. See notes 1 and 2 *supra*.

8. The following questions and answers between the court and counsel occurred:
Q: [Counsel], do you have any reason to believe that if this case goes to trial, you cannot represent your client with the vigor and the zeal that the Code of Professional Responsibility requires in this case?
A: Subject to one proviso, that I would need to take some amount of time to be with my wife.
    \*    \*    \*    \*    \*    \*
Q: But I mean while the case is in trial, could you represent—

*Matthews*, 459 A.2d at 1065 (citing *Monroe, supra*, 389 A.2d at 821). The consideration of each criterion in turn reflects the flaws in the court's *Monroe–Farrell* inquiry.

First, although the court inquired about, and counsel informed the court that he had conferred with appellant about trial issues between 10 and 15 times and had spoken with him between 30 and 40 times, the trial court did not question whether that time was devoted to preparing a defense, as opposed to plea discussions. Since appellant claimed that counsel had not developed a defense, had left investigation to him, and had not reviewed his "paperwork," the court failed in its responsibility to elicit information to determine whether appellant's allegations about counsel's failure to prepare to defend were true. Counsel admitted that he had not informed appellant initially of his rights because appellant had previously given a lengthy statement to police. However, the court did not inquire whether counsel informed appellant of his rights at any time.

Second, despite appellant's allegations that counsel had not "overlooked" his "paperwork" until the day of trial and had not developed a defense, the trial court did not inquire into the type of investigation counsel undertook in an effort to establish a defense or to ascertain the viability of any defense. Such an inquiry would not have required the court to "evaluate the strategic options open to an attorney ... or to otherwise engage in speculative judgments[ ]", but it would have allowed the court to "evaluate the[ ] sufficiency [of counsel's preparation] under the circumstances." *Monroe, supra*, 389 A.2d at 819. The trial court elicited no information about the "concrete steps taken by counsel in preparation of the case." *Id.* Instead, it accepted counsel's general assertions that witnesses had been contacted and that two investigators had been hired. The trial court was not informed of whether appellant provided counsel with defense leads or whether any such leads were investigated by counsel.

The third criterion, which focuses on whether counsel has made a factual and legal investigation sufficiently in advance to permit reflection and to determine if a defense could be developed, was not met. The court's inquiry revealed that counsel had failed: (1) to investigate the crime scene, (2) to subpoena a particular police report, (3) to file a motion to suppress appellant's lengthy statement to the police, (4) to subpoena defense witnesses, and (5) to prepare for *voir dire* and opening statements. Nevertheless, the court found counsel's explanations for his omissions to be satisfactory, and it never questioned the extent of counsel's actual preparation. The trial court inquired only generally about such matters as whether counsel had sought discovery and whether there were issues of identification. Although the court asked counsel whether he had time to prepare, it did not ask whether he actually had prepared for trial. The trial court's failure to elicit the information required by *Matthews* and to "ascertain the concrete steps taken by counsel in preparation of the case," *Monroe, supra*, 389 A.2d at 819, shows that the *Monroe–Farrell* inquiry was not "sufficient to determine the truth and scope of the defendant's allegations." *Nelson, supra*, 601 A.2d at 591.[9]

In my view, reversal is warranted in this case because the *Monroe–Farrell* inquiry was inadequate and because the record of that hearing demonstrates that trial counsel was not prepared " 'within the normal range of reasonable competence demanded of attor-

---

**9.** Contrary to the government's argument, this case is similar to the situation presented in *McFadden v. United States*, 614 A.2d 11 (D.C. 1992), where this court reversed the judgments of conviction because of trial counsel's inadequate preparation for trial. See *id.* at 18. In *McFadden*, the trial court had failed to make a " 'substantive inquiry ... to elicit from counsel information to rebut, or substantiate the specifics of [defendant's] complaints.' " *Id.* at 16 (quoting *Monroe, supra*, 389 A.2d at 821). How- ever, unlike this case, counsel admitted more fully and explicitly that he had failed to confer adequately with the defendant, had not investigated the case factually or legally, had not located or ascertained the witnesses and had not determined the theory or defense as of the scheduled trial date. We reversed "because the record revealed both that the type of inquiry contemplated by *Monroe* did not occur ... and that there was inadequate trial preparation and consultation by counsel." *Id.* at 18.

neys in criminal cases.' " *McFadden, supra,* note 8, 614 A.2d at 18. Therefore, appellant was deprived of his Sixth Amendment right to counsel, and the integrity of the adversarial trial process was undermined. *See Monroe,* supra, 389 A.2d at 819. For these reasons, I respectfully dissent from the opinion of the court.